# CHARLESTON.

## BARTLETT V. BANK OF MANNINGTON.

### Submitted October 5, 1915.  Decided December 7, 1915.

1. MONEY PAID—*Right to Recover—Payment of Another's Debt.*

    Money paid by one person on the debt of another, at his request, or by his procurement, may be recovered from him, in assumpsit on the common count for money paid, laid out and expended for his use and benefit and at his request, and the method or form of the transaction is immaterial, if it amounts to payment in law or is so treated by the creditor.  (p. 340).

2. APPEAL AND ERROR—*Presentation Below—Evidence.*

    Errors in the rulings of the trial court upon the admission and rejection of evidence are deemed to have been waived, if they are not made grounds of the motion for a new trial, nor subjects of special bills of exception, showing the evidence and the rulings of the court thereon.  (p. 340).

3. SAME—*Presentation for Review—Instructions.*

    To obtain a review of the action of the trial. court, in refusing to give certain instructions at the instance of the complaining party, the record of the cause must show, by bills of exceptions or otherwise, what instructions were given at his instance, so as to enable the appellate court to determine whether any error has been committed in the rulings.  In this instance, as in most others, there is a presumption in favor of the correctness of the rulings of the trial court, which prevails unless rebutted by the record.  (p. 340).

4. SAME—*Presentation for Review—Bill of Exceptions—Instructions.*

    A bill of exceptions, showing the giving of one instruction for the plaintiff and the refusal of five asked for by the defendant, without

more, is deemed and held not to disclose all the rulings of the court upon the requests for instructions.  (p. 340).

5.  EVIDENCE—*Judicial Admissions in Another Case—Avoidance of Effect.*

Judicial admissions made in one case are evidence in another, but are not conclusive, and the effect thereof may be avoided by proof of their having been made under a misapprehension of fact.  (p. 343).

6.  NEW TRIAL—*Issues Dependent on Conflicting Evidence—Province of Jury.*

Issues dependent upon conflicting oral evidence and uncontroled by any admitted or clearly established facts, fall within the province of the jury, and its finding thereon cannot be disturbed by the court.  (p. 343).

7.  ESTOPPLE—*Defense—Misrepresentation—Injury.*

One who has wrought injury to himself by a misrepresentation which caused another to do the injurious act is estopped from complaining of such act, in an action brought by such other person against him.  (p. 344).

8.  ASSUMPSIT, ACTION OF—*Declaration—Variance—Time.*

The time laid in a declaration in assumpsit, containing only the common counts, is immaterial and may be departed from in the proof.  (p. 344).

(LYNCH and MASON, JUDGES, absent.)

Error to Circuit Court, Marion County.

Action by Fred W. Bartlett against the Bank of Mannington.  Judgment for plaintiff, and defendant brings error.

*Affirmed.*

*L. S. Schwenck, M. M. Neely* and *John A. Howard,* for plaintiff in error.

*W. S. Meredith, Tusca Morris, W. M. Hess, E. F. Morgan* and *Harry Shaw,* for defendant in error.

POFFENBARGER, PRESIDENT:

Claiming to have been a surety of the defendant for a certain debt, amounting to $6,500.00 and evidenced by a certain promissory note, the plaintiff obtained a verdict and judgment for the sum of $5,417.18, as for money paid by him, as such surety, on said debt.  The principal assignments of error assume insufficiency of the evidence to sustain the verdict.

The history of the debt is somewhat lengthy and is involved in more or less controversy. Its origin dates back, at least, to April 7, 1902, but the plaintiff, Bartlett did not become connected with it until January 21, 1905. It was originally a part of a debt of $12,500.00, which was divided into two parts, in July 1904. It seems to have grown out of transactions between the Bank of Mannington and the Mannington Glass Works Co., resulting at one time, in indebtedness of the latter to the former, in various forms, amounting in the aggregate to more than the entire capital stock of the bank. That the $12,500.00 went to the Glass Works Co., is clearly indicated by the evidence, but the money was obtained from the First National Bank of Mannington, as the proceeds of a note, dated April 7, 1902, in which the maker was the Bank of Mannington and on which the Mannington Glass Works Co. and one Virgil T. Clayton, owner of nine tenths of the capital stock of said company, were indorsers. In that form, it was renewed a number of times. On January 2, 1904, however, its form was changed. Clayton became the maker and the Bank of Mannington the indorser. In this altered form, it was again renewed, April 2, 1904. In July 1904, it was divided into two notes, one for $6,000.00 and the other for $6,500.00, in each of which the Bank of Mannington was the maker. In Oct. 1904, these notes were renewed, with the Bank of Mannington as maker of the $6,000.00 note, and E. J. Thomas as the maker of the $6,500.00 note and the Bank of Mannington indorser thereof. With each of them, there was deposited a collateral note of V. T. Clayton for an equal amount. On January 21, 1905, the Bank of Mannington renewed the $6,000.00 note. At or about the same time, E. J. Thomas and F. W. Bartlett became the makers of the $6,500.00 note, and the Bank of Mannington indorser. It was dated January 21, 1905, and substituted for the note for the same amount, made by Thomas, October 21, 1904. After further renewals, the Bank of Mannington paid the $6,000.00 note, August 21, 1905. The $6,500.00 note, due April 21, 1905, was not then renewed. No provision was made for it, until April 17, 1908, when it, with the accumulated interest, amounted to $7,984.71. At that time, Thomas and Bartlett executed their note for $7,500.00 which the Bank of Manning-

ton indorsed.   As provision for the residue of the debt, Bartlett made his note to Thomas which was indorsed by the latter and the Bank of Mannington.   These notes were renewed Sept. 28, 1908, the smaller one for a larger amount, so as to include the interest.   They were again renewed Nov. 21, 1908, and the interest added to the smaller one.   In this manner, they were carried along until March 4, 1909, when Bartlett executed his note for $7,500.00 which S. A. Hendrickson, his mother, and the Bank of Mannington indorsed, and she made her note for $725.84, the balance of the debt which Bartlett and the bank indorsed.   These, together with a $500.00 debt of Bartlett's added, July 2, 1909, were carried along, and the interest paid by Bartlett, until July 29, 1910, when he paid on account thereof, $3,225.84, reducing the amount to $5,000.00, for which he executed his note, with S. A. Hendrickson and the Bank of Mannington as indorsers. This was renewed from time to time, until Jan. 18, 1912, Bartlett paying the interest.   The payments so made, with interest thereon, constitute the items of his bill of particulars, filed with his declaration asserting right of recovery on the common counts in assmupsit.

Though, in its inception, the debt was admittedly *prima facie* that of the Bank of Mannington, it is insisted that, in reality, it was the debt of the Mannington Glass Works Co. or Clayton, and that, if Bartlett has any right of recovery, it is against one of them.   If this position is not tenable, then it is said E. J. Thomas, Bartlett's co-maker, assumed the debt and made it his, before Bartlett became a party to the note and that, if he is a mere surety, his right of recovery is against Thomas.   If this ground of defense should prove untenable, then it is urged that Bartlett assumed the debt and made it his own, in consideration of the assignment to him of 139 shares of the capital stock of the Mannington Glass Works Co., 39 of which had been held as collateral security for the note, and 100 of which Thomas assigned to him.   Finally, it is urged that he is estopped by his conduct from asserting any right against the bank.

The first ground of defense has little or no foundation in the record.   No doubt the Mannington Glass Works Co. was the ultimate and final beneficiary of the money borrowed of

the First National Bank of Mannington, but the loan was made to the Bank of Mannington, on its note, and not to the Glass Works Co. With that transaction, Bartlett had no connection whatever, and, in so far as Thomas took part in it, he acted as cashier of the Bank of Mannington, and he was not a formal party to it in either his individual or his official capacity. The defendant bank according to the evidence, had previously loaned the Glass Works Co., or Clayton, or both, an equal amount of money, or subsequently made such a loan, but; as to this particular money or transaction, it became the debtor of the First National Bank of Mannington. The exigency which occasioned the application for the loan, or the disposition of the money, after it was obtained, are alike immaterial.

The date of Thomas' alleged assumption of the $6,500.00 note, as a part of the $12,500.00 debt, was December, 1904. When the note was first divided, in July 1904, the two notes were made by the Bank of Mannington. When they became due in October 1904, Thomas became the maker of the $6,-500.00 note, but it is not claimed he then assumed payment thereof. He denies that he ever did so. He had been the cashier of the bank for several years. By reason of transactions with the Mannington Glass Works Co., and other concerns the bank's financial condition had become very bad, and, in September 1904, its board of directors began an investigation which continued for some time and resulted in the adoption of strenuous measures against the cashier and some of the directors, for restoration or reimbursement of the bank, on account of bad loans made. Very large amounts were charged to Thomas, on this ground, and he was required to secure them by a deed of trust covering practically all of his property. It was not claimed that he had misappropriated any of the bank's money or was indebted to it for money borrowed. Hamilton, president, and Huey and Tetrick, directors, as indorsers of bad notes, were compelled to make them good. The $6,500.00 note in question was not included in the deed of trust. By way of explanation of the failure so to include it, the directors say he was already bound as maker of the note and they deemed it unnecessary, for that reason, to require him to make a new obligation for it, in any

form. They say, further, that he agreed to pay it, in consideration of his misconduct relative to another note of $6,-000.00, in consequence of which the bank sustained a loss of about $13,000.00. This was a note of Clayton's. They say the cashier was ordered to obtain a new note of his, indorsed by his mother, for $6,500.00, the amount of the old note and accumulated interest, and that, Clayton having brought in such a note, Thomas failed to substitute it for the old one, and, on the contrary, in violation of the orders of the board of directors, gave Clayton cash on it, and then afterwards, by his failure to protest the note, lost, the indorsement of Josephine B. Clayton, the mother of V. T. Clayton. All of this except the loss of the indorsement, which he says was practically worthless, or, at least, wholly inadequate, Thomas denies. He positively and emphatically denies that he let Clayton have the money on the new note.

An admitted, unequivocal and vigorous denial of the agreement of December 1904, was made by Thomas, less than two years after that date, and more than seven years before the date of his testimony in the trial of this case. By a written agreement, dated Sept. 21, 1906, and a contemporaneous assignment, Virgil T. Clayton, owner of 450 shares of the capital stock of the Mannington Glass Works Co., and Josephine B. Clayton, his mother, owner of some right, title or interest in or respecting certain glass-blowing machines used and operated in the factory of the Mannington Glass Works Co., made over and transferred to the Bank of Mannington, E. J. Thomas, J. O. Huey, M. F. Hamilton and the widow and heirs of J. M. Tetrick, all of said shares of stock and the interest in the glass-blowing machines, for and in consideration of their release of Virgil T. Clayton from all liability to the bank and the other parties above named or any of them, on account of notes, obligations, due-bills, accounts, choses in action or any other evidence of indebtedness held by any of them, or to which they or any of them might be entitled directly or indirectly, as principals, sureties, indorsers, guarantors or otherwise. This having been done, the creditors of Clayton divided among themselves, the 450 shares of stock, proportionately with the amounts of their debts so released. Thomas took a number of them, at least 100, as creditor for

debts that had been charged to him, on account of transactions with Clayton and the Mannington Glass Works Co. The bank took a large number of them, at least, 193, and Hamilton, Huey and the Tetrick heirs, the residue, save 39 which were apportioned to the $6,500.00 note tendered to Thomas, on the assumption of his agreement to pay that note. It is admitted that he denied the agreement and refused to accept these 39 shares. The certificate therefor, however, was attached to the note as collateral, by somebody, possibly Thomas.

As to what transpired on the occasion of the execution of the note of Jan. 21, 1905, there is sharp conflict between the testimony of Thomas and that of the president and some of the directors of the bank. On this date, it will be remembered, Bartlett first became connected with the debt. Thomas says he obtained Bartlett's signature to the note, at the request the directors of the bank and upon on intimation from them, that the First National Bank of Mannington desired additional security on the note. In this connection, as well as others, he contends that his assumption of other debts and his procurement of additional security on this note, were merely provisional. As cashier of the bank for many years, he had maintained confidential relations with all of its customers, wherefore he felt it to be his duty to keep the institution going and protect the interests of all as far as possible. He says both he and the directors hoped to be able to extricate it from its perilous situation, and, to that end, they contemplated the taking over of the stock of the Glass Works Co., from Clayton, who or whose company, was the largest defaulting creditor. Moreover, he claims to have been coerced into the assumption of such debts as he secured by his deed of trust, by the threat of the directors to close the bank and thus sacrifice the interests of the depositors, his frineds. Bartlett, in his testimony, insists that he understood, at the time at which he signed the note with Thomas, as maker, that he was doing it for the accommodation of the bank. He was a stockholder of that institution and, of course, had confidence in the directors and the managers thereof. As to what occurred between him and Thomas, on that occasion, his testimony and Thomas' are in substantial accord. Thomas says he told Bartlett the paper was the note of the Bank of Mannington and that the

directors desired him to indorse it, because the First National Bank required additional security, and, further, that the matter would be adjusted in a short time, and arrangements were then being made by which the two banks would take over the securities held by them from the Glass Works Co. and Clayton. Bartlett says Thomas' request was made in the following terms: ''Fred, the Directors are having a meeting at the bank and ask as a personal favor that you sign this note,'' and explained as follows: ''Now we are carrying this note at the First National Bank and you sign it, and we wont ask you to sign it any more. We will take care of it when it comes due.'' None of the directors heard the conversation between Thomas and Bartlett, but several of them contradict Thomas as to what occurred between him and themselves. Snodgrass, now president of the bank, then vice-president, says Thomas came to the directors' room, when he and others were present, but whether in meeting or not, he does not know, and said the First National Bank was pressing him to settle the $6,500.00 note and asked if the bank would take it up for him, and carry it and they declined to do so; and that he then said he would arrange to get his brother to help him out at the First National Bank and intended to get Bartlett to go on a note with him at Terra Alta, for money with which to pay some of his indebtedness to the Bank of Mannington; that, thereupon, it was suggested that he get Bartlett to go on the note at the First National Bank, the $6,500.00 note, and use his brother's assistance in obtaining money at Terra Alta for the other purpose; and that he then went out and obtained Bartlett's signature. Huey, a director, says Thomas got Bartlett on the note, because the directors refused to let the bank indorse it without further security. With this, Hamilton, who was president of the bank at the time, substantially agrees. Thomas repeatedly and emphatically denies this, saying the request came from the directors and that they themselves suggested procurement of Bartlett's name on the note.

The following facts are relied upon, as proving Bartlett's assumption of the debt in March, 1909. From the renewal notes dated, March 4, 1909, the name of Thomas was dropped. Bartlett executed the $7,500.00 note, making it payable to S.

A. Hendrickson who indorsed it, and she signed the $725.84 note making it payable to Bartlett who indorsed it. The Bank of Mannington indorsed both. On the occasion of this renewal, Bartlett paid the interest, for the first time and thereafter continued to pay it, until Jan. 18, 1912, a few days before the institution of this action. For the plaintiff, it is insisted that S. A. Hendrickson was introduced as a party to the notes, July 2, 1909, but resolutions passed by the board of directors on the 6th and 13th days of March, 1909, describing the notes to which she was a party, as having been dated, March 4, 1909, fix the date approximately. On the consummation of this new arrangement, which may not have occurred until later in the month, Bartlett took the certificate for the 39 shares of stock of the Mannington Glass Works Co., which had been pledged with the note, and obtained from Thomas a certificate or certificates for an additional 100 shares of that stock. These shares had been apportioned to Thomas, out of the 450 shares obtained from Clayton, and left with the bank as collateral security for the debts Thomas had assumed, but just prior to the date of the introduction of Mrs. Hendrickson, as a party to the notes, Thomas had obtained them from the bank, by substitution therefor of two notes made by the Mannington Glass Works Co. and payable to his mother and brother, for the sum of $9,000.00, and bonds of the Mannington Glass Works Co., as collateral security for these notes. Prior to the dates of these transactions sometime in 1907, Bartlett had bought 193 shares of the stock of the Mannington Glass Works Co., from the Bank of Mannington at $7.00 per share, and, by a reorganization of the company subsequently made, he became its president, V. T. Clayton general manager and Thomas bookkeeper. On April 19, 1909, the plant of the Glass Works Co. was destroyed by fire and the bonds pledged for the two notes last above mentioned, were paid out of the insurance money, but the stock was rendered practically worthless.

Bartlett admits the purchase of the 193 shares of stock from the bank and his acceptance of the 139 shares of the stock, but denies that he took the latter as owner or otherwise than as collateral security for the debt for which he had obligated himself, first with Thomas and then with his mother.

77 W. Va.

No transfer of these shares is proved and he says he thinks Thomas, on delivery of the certificate for the 100 shares, merely assigned it, by a pencil signature. His contention is that being obligated for this debt, as surety he took the shares and resorted to other transactions in connection with the Glass Works Co., in order to save himself, as far as possible, from pecuniary loss. Though he claims to have signed the note with the understanding that it was an obligation of the bank, he afterwards treated the debt as that of Thomas and says he was induced to do so by representations made to him by officials of the bank, and particularly by Snodgrass who was the leader in the investigation of the affairs of that institution and in its reorganization. Under the influence of this alleged misrepresentation, he took Thomas' stock, according to his contention, in the hope and with the expectation of saving himself from loss by reason of his suretyship for Thomas. Under his alleged misapprehension of the real situation, he brought an action at law against Thomas for the full amount of the note and its accumulated interest and obtained a judgment therefor by confession, and later instituted and prosecuted to final decree, a suit in equity for enforcement of the judgment lien, and caused Thomas' real estate to be sold. By this procedure, however, he realized nothing, because of the priority of liens in favor of the Bank of Mannington, by virtue of its deed of trust.

He says, that, at the time he signed the note, he not only believed it to be an obligation of the bank, but also that the bank was in excellent condition. He and his mother owned about twenty shares of its stock, and one of the directors had informed him, just a few days or weeks before, that the stock was worth par. He denies that, at that time, he knew anything of the investigation which had been concluded in December 1904, and also that he had any knowledge of the deed of trust Thomas had executed in favor of the bank. Having later discovered these facts, or the difficulty into which Thomas had fallen, he says he was induced by Snodgrass and others to believe the debt was Thomas'. As to the origin of this impression, he says: ''Well about the only information I could get with respect to that was through Mr. Snodgrass. * * * The information I got was this: That

Thomas had not been doing the right thing, or something like that, had robbed the bank or made some bad transactions, and the Directors and everybody else seemed to be pretty close mouthed about it. * * * I was under the impression that it was Thomas' debt. * * * In a few weeks afterwards, I tried to make some inquiry about it, and I am pretty well satisfied it was Mr. Snodgrass that told me, or gave me to understand,—didn't come out straight or square about it,— he said that Thomas, as much as to say, was doing me up, or getting me on some bad paper, or doing the bank up, or something like that; and I was then informed it was Thomas that had caught me." Snodgrass says Bartlett, in his conversation with him, left him under the impression that he, Bartlett, regarded the note as Thomas' debt, and then says: "I want to say he talked to me early in the year 1905, and I told him everything about it. Mr. Thomas executing the Trust and being liable for that note; and all about it; never withheld anything from him, that he asked me, if I had the information." He further admits that this conversation occurred after Bartlett had signed the note. Nothing in the record imports knowledge on Bartlett's part, of the origin of the debt, at the time he signed the note. Nor does it appear that he knew it, before he bought the glass works stock, or procurred the assistance of his mother in the carrying of the debt, or prosecuted the suits against Thomas. Though Mr. Snodgrass says he told him "all about it" these general terms seem to be limited to the execution of the deed of trust and Thomas' liability for the note. He does not say he informed Bartlett that the debt, as originally made at the First National Bank, was the debt of the Bank of Mannington.

After his unsuccessful pursuit of Thomas, Bartlett was informed by one Hess, who had been an attorney for the First National Bank of Mannington, that the Bank of Mannington, not Thomas was the real debtor and ultimately liable for the note in question. He says Hess' advice or information was: "You are after the wrong party. Thomas never got that money and don't owe it, and you never got it and don't owe it; the Bank of Mannington got that money from the First National." Very soon after the date of this information, he brought this action against the Bank of Mannington.

The legal theory of the plaintiff's action does not seem to be questioned. If the debt on account of which he has made payments was the debt of the Bank of Mannington and was not assumed by Thomas nor by himself, his right to recover seems to be admitted, unless he has estopped himself by his conduct. That one who has paid the debt of another, at the request of the latter, express or implied, may recover from him the money so paid for him, is elementary, and the form of the payment, if it really amounts to payment, or is treated as such by the creditor, is not very material. It is only necessary, therefore, to consider such rulings of the court, made in progress of the trial, as have been brought up by the bills of exception.

The motion for a new trial was not founded upon any claim of admission of improper evidence or rejection of proper evidence, nor have any of the rulings relating to the admission or rejection of evidence been made the subjects of special bills of exception. Such errors respecting these matters, as may have been committed, are deemed to have been waived. *Parr* v. *Powell*, 74 W. Va. 414; *State* v. *Heneghan*, 73 W. Va. 706; *Iraland* v. *Smith*, 73 W. Va. 755; *Halstead* v. *Horton*, 38 W. Va. 727; *Gregory* v. *B. & O. R. Co.*, 37 W. Va. 606.

The bill of exception does not purport to set forth fully the action of the court upon the instructions. It shows the giving of one instruction for the plaintiff and the refusal of five asked for by the defendant. As to whether any were given at the request of the defendant, it is wholly silent. Nor does it show whether more than one was given for the plaintiff. It does not say the instructions set forth were all of those acted upon by the court. In the matter of instructions, as in all others, except such as are jurisdictional or rise to the dignity of constitutional guaranties, there is a presumption of correctness as to the rulings of the court, which the party complaining must overthrow, in order to obtain a new trial on account thereof. The appellate court cannot presume error. The record in the court below must be so made up as to overcome a presumption of correctness in the rulings on ordinary questions. Accordingly we have held the refusal of proper instructions not to be ground for a new trial, if others given at the instance of the complaining party, have been omitted

from the transcript by his direction.  *Ohio Valley Bending Co.* v. *Pickens,* 74 W. Va. 303.  The principle adopted in that case necessarily governs in all others, in which the bill of exceptions has not brought up all of the instructions.  It is impossible for the appellate court to know whether the complaining party has been prejudiced or not, if he makes the record show only the refusal of certain instructions asked for by him.  The ground of refusal of those rejected may have been the giving of others of the same import.  Only the rulings adverse to the defendant are disclosed.  Neither by consecutive numbers, nor in any other way, do these instructions appear to be all that were before the court.  Apparently the bill of exceptions was drawn with a studied effort to make only a partial disclosure of the rulings on instructions.  By no rule of interpretation can it be regarded as complete.  For this reason, only the peremptory instruction asked for, which would have required the jury to find for the defendant, can be considered, and it requires no separate discussion, because the test of the correctness of the court's action upon it is sufficiency of the evidence to sustain the verdict, applicable also upon the inquiry as to whether it was error to overrule the motion to set aside the verdict.

In the absence of instructions which may have been given, it is impossible to say whether the objection made to the instruction certified as having been given at the instance of the plaintiff, is well founded or not.  It is a binding instruction hypothetically submitting the plaintiff's theory of the case. A vast number of evidential facts are omitted, but the rule applicable to such instructions does not require a recital of the evidence in detail, nor even a summary or resume of it. It suffices to submit to the jury the controling issues of fact. Upon the plaintiff's theory of the case, this instruction does that.  Beginning with the origin of the debt, the $12,500.00 note of April 7, 1902, and tracing it down to Oct. 21, 1904, it submits inquiries as to whether it was and continued to be the debt of the bank and whether the payments made by Bartlett on renewals of the note of Oct. 21, 1904, were made for the use and benefit of the defendant.  In general, this covers the case, but not minor and subsidiary issues.  Its omission of the defendant's theory is unobjectionable, if the

court gave one submitting that theory. Instructions are to be read and considered as a whole, and if, being so read, they correctly state the law, the inconsistency or conflict of the opposing theories does not vitiate them, for that is an element or factor in almost every jury trial. Whether the court gave one or more instructions submitting the defendant's opposing theory dependent upon the evidence it adduced in support thereof, the record, as presented here, does not say. If, without it, the instruction given would be erroneous, as the plaintiff in error says it is, then there is a presumption that the court gave it and this presumption is not rebutted by anything in the record.

From what has been said, it is manifest that the jury could well say the original note for $12,500.00 was the debt of the Bank of Mannington. Whether Thomas assumed payment thereof, and made it his own, depended upon conflicting oral testimony, and was, therefore, a question for the jury. The conflict in the evidence as to this is not determined by any undisputed or clearly established fact. As late as March 13, 1909, a resolution passed by the bank's directors, authorizing endorsement of the Bartlett-Hendrickson notes, by the bank, and delivery thereof in renewals of others, dated Nov. 21, 1908, declared said last two notes were "owing to the First National Bank by this bank." None of the circumstances relied upon as proving Bartlett's assumption of the note are conclusive. For almost three years after maturity of the first note he signed, it lay in the First National Bank unpaid, unrenewed and unprovided for. Not until he had been sued on it, did he make any provision for it. In the meantime, he had bought the 193 shares of stock of the glass works company from the Bank of Mannington. This purchase was not contemporaneous either with the renewal of the note, in April, 1908, nor with the introduction of Bartlett's mother, as a party, in March, 1909. It was not a consideration of his alleged assumption of the debt, for he paid for the stock. Nor had he then received the 100 shares from Thomas, or the 39 shares held as collateral for the $6,500.00 note. He never got them until the early part of the year 1909. For its surrender of the 100 shares, the bank took other and better collateral from Thomas. Obviously that transaction con-

stituted no consideration for Bartlett's alleged assumption of the debt. The jury could consistently find that he held the 139 shares of stock as collateral, agreeably to his testimony and that of Thomas, deeming all of it Thomas' under the representation that the debt was his.

In pursuing Thomas, as principal in the debt, Bartlett says he acted under a misapprehension of the real situation, super-induced by the conduct and representations of the bank's president, and his testimony as to this is not overcome by any undisputed or established fact. Indeed, it is scarcely contradicted. There is no direct and specific evidence of knowledge on his part, of the nature of the debt at the time it was made, until after completion of the stock transaction with Thomas and the legal proceedings against him. His apparent satisfaction with the condition of affairs, until after the loss of the factory by fire, is only an evidential circumstance entitled to such weight as the jury saw fit to give it, and not at all conclusive. Whether it or attorney Hess' disclosure of the original character of the debt was the moving cause of the present action against the bank, was manifestly a question for the jury. Who is better able to say which circumstance exerted the greater influence? Moreover, he had never, by any express agreement, released the bank from any obligation to which it may have been subject. Believing himself to be the surety of Thomas, he could accept such provisions for satisfaction or indemnity as Thomas was able or willing to make, without any intention to release the bank whose liability was then unknown to him. The admission arising by necessary implication from the legal proceedings against Thomas, though technically a solemn one, does not amount to an adjudication between Bartlett and the bank. It is evidence of high character, but only inconclusive evidence, and its effect is avoided by proof of the misapprehension under which it was made. *Lee* v. *Virginia, etc., Co.,* 18 W. Va. 299; *Ray* v. *Clemens,* 6 Leigh 600; *Breathed* v. *Smith,* 1 Pat. & H. 301; *Morrison* v. *Householder,* 9 Va. 627; R. C. L. p. 500. The issue here involved was not raised in the equity suit against Thomas, to which the bank was a party. It was made only as a lien creditor of Thomas. Hence, the admission made in that suit is of like character as the one made in the law case.

Nor does any estoppel arise from the taking over of the collateral pledged to secure the note. The jury could find that such prejudice or injury as the bank suffered in consequence thereof was the result of its own misrepresentation as to the real character of the debt for which Bartlett gave his note. If it falsely represented Thomas to be the principal debtor and thereby induced Bartlett to take the stock and hold it for Thomas and as collateral for the debt, it is not in a position to complain of any resultant injury or loss to itself. Moreover, there is no proof that Bartlett placed the stock beyond its reach. If, desiring to effect a sale thereof, it had called for the shares for that purpose, it does not appear that they would not have been delivered up by Bartlett and Thomas upon an agreement to credit the proceeds on the note. Thomas says the 100 shares were still his and were held as collateral by Bartlett and the latter says he held them only as collateral. Besides, the bank received more than their value, on its release thereof. Thomas says the 39 shares belonged to the bank and Bartlett says he held them as collateral, supposing them to be Thomas's, and they belonged to the bank, unless Thomas assumed the debt.

All of the money sued for was paid before the action was brought. That some of it was paid after the date laid in the declaration is immaterial. *Connolly v. Ballinger,* 67 W. Va. 30; *Tabb* v. *Gregory,* 4 Call. 225.

Seeing no error in the judgment, we will affirm it.

*Affirmed.*