87 S.E.2d 689 (1955)
STATE of West Virginia
v.
Malcolm Cameron BRAGG.
No. 10701.
Supreme Court of Appeals of West Virginia.
Submitted January 25, 1955.
Decided March 8, 1955.
Dissenting Opinions March 24 and June 7, 1955.
*693 W. Hayes Pettry, Emerson W. Salisbury, Charleston, for plaintiff in error.
John G. Fox, Atty. Gen., Harold A. Bangert, Jr., Asst. Atty. Gen., for defendant in error. *690 *691
*692 RILEY, Judge.
Malcolm Cameron Bragg was indicted for murder at the January, 1954, term of the Intermediate Court of Kanawha County, and convicted of murder of the first degree without recommendation for mercy. Upon writ of error to the Circuit Court of Kanawha County, after consideration of the petition, the transcript of the evidence, and the bills of exceptions, that court affirmed the judgment of the Intermediate Court of Kanawha County. To the judgment of the Circuit Court of Kanawha County, affirming the judgment of conviction had in the intermediate court, the defendant prosecutes this writ of error.
The defendant was indicted in the Intermediate Court of Kanawha County, at the January, 1954, term thereof. On the 1st day of March, 1954, the trial having come on to be heard, the defendant moved the court that the case be continued until the next term, which motion was overruled by the court. The defendant then moved that the venue of the trial upon the indictment be changed to some other county in West Virginia, which motion was likewise overruled. To these rulings the defendant objected and excepted, and the defendant then entered his plea of not guilty.
On March 1, 1954, a jury was impaneled and qualified, and the case having been heard, the jury, on March 3, 1954, rendered the following verdict: "We, the jury, find the defendant guilty of murder in the first degree." The defendant, by counsel, having moved the court to set aside the verdict of the jury and grant defendant a new trial, which motion the court denied, the defendant then objected and excepted to the court's ruling. Thereupon the court immediately pronounced judgment that the defendant be punished by death.
On March 8, 1954, the defendant, Malcolm Cameron Bragg, filed in the intermediate court a pauper's affidavit, for the purpose of securing from the court reporter a transcript of the evidence and proceedings of the trial had in the intermediate court, *694 without charge to the defendant, for use in making defendant's application for a writ of error to the circuit court, which affidavit assigned thirteen grounds upon which counsel for defendant stated a writ of error to the circuit court would be sought, among which are the two following grounds:
"1. That the Court erred in permitting the prosecuting attorney to inquire of the defendant, Malcolm Cameron Bragg, whether or not the said Malcolm Cameron Bragg had a license to carry the death weapon, a pistol, and required the said Bragg to answer said question over the objections of the defendant's counsel, and which said answer by the defendant was that he did not have a license to carry said pistol;
"2. The Court erred in refusing the defendant's motion for a new trial when the prosecuting attorney inquired of Malcolm Cameron Bragg whether or not he had a license to carry the pistol and Bragg answered that he did not have a license to carry a pistol, when the said question by the prosecuting attorney had been objected to by defendant's counsel;".
The defendant, who is twenty-three years old, was born on Paint Creek in Kanawha County, West Virginia, and spent most of his life in that county. At an early age he was committed to the West Virginia Industrial School for Boys at Pruntytown, for a minor infraction of the law. At the age of sixteen he entered the United States Army, and, after serving for about seven months, received an honorable discharge. On September 23, 1947, he reenlisted in the army at the recruiting station in Charleston, and remained in the service until February 17, 1948, when he was given what he terms "an undesirable discharge", for the reason that he had failed to inform the army authorities that he had been in the army previously. He again reenlisted in the army on November 3, 1948, at the Charleston recruiting station. In 1948, while absent without leave (A. W. O. L.) Bragg was arrested in Hillsville, Virginia, and charged with the crimes of grand larceny and breaking and entering committed in the State of Virginia. After having served four and one-half years of two three-year sentences in the Virginia penitentiary, Bragg went to the City of Logan, and stayed with his parents until the latter part of October, 1953, when he accompanied his family to the State of Ohio, where his father was employed, and where he was employed for a short time.
On November 6, 1953, defendant left the Town of Roseville, Ohio, where he was working, and arrived in Charleston about five-thirty on Saturday morning, November 7, 1953. On that morning he visited the Rose City Cafeteria, located on Summers Street in Charleston, in search of employment as a short order cook. Shortly before noon on that day he left Charleston on a bus bound for the City of Logan, where he arrived between one and one-thirty in the afternoon. Immediately upon his arrival there he associated himself with two young women, Dolly Rice and Macie Welch, and accompanied them to a tavern in Logan called the Wheel Cafe, where the three drank a large quantity of beer. According to the defendant the three stayed at the Wheel Cafe, with the exception of an hour or so, until about midnight on November 7, 1953. Bragg then went with Dolly Rice to the West Virginia Hotel, an establishment located in the City of Logan, where they spent the night together.
There is substantial evidence in the record to the effect that the defendant was grossly intoxicated on the night of November 7. The next morning he and the Rice girl arose between eleven and eleven-thirty, and went to a place in or near the City of Logan, known as the Columbia Cafe, where they had breakfast. After breakfast the two returned to the Wheel Cafe where they again began to drink beer and whiskey. While there on the afternoon of November 8, 1953, Sunday afternoon, the decedent, *695 Robert Gullett, with whom the defendant was not previously acquainted, joined the group, and the deceased, the defendant, Dolly Rice and Macie Welch remained at the tavern for some time drinking beer.
While the four persons were together at the Wheel Cafe on Sunday afternoon mention was made of the fact that the defendant Bragg intended to return to Charleston that night, and the deceased, who operated a taxi-cab for a local taxi-cab company, offered to take defendant to Charleston, after he returned to work at the scheduled time of five o'clock in the afternoon. Evidently Bragg and deceased arrived at an agreement for Gullett to drive defendant to Charleston in the former's taxi-cab. It appears that the regular fare for taxi-cab service between Logan and Charleston was twenty dollars, of which the employer gives the driver eight dollars commission, leaving the sum of twelve dollars to be paid to the company. However, Bragg testified that Gullett stated he would take defendant to Charleston for thirteen dollars, because, as he testified deceased said, "Because I may want a bottle of beer or a hamburger on the way over and in that way all expenses will be paid and it won't cost me anything."
About eight-fifteen on the night of November 8, 1953, Gullett and Bragg, with Gullett driving his employer's taxi-cab, left Logan for Charleston. As the defendant Bragg was the only eyewitness to the homicide, his narration of the events which lead directly to the fatal shooting must be stated in some detail.
According to Bragg, after leaving the City of Logan, both Gullett and Bragg had several drinks of whiskey, and evidently no trouble arose between them until the taxicab was driven within twenty-five miles of the City of Charleston. There Gullett, so defendant testified, informed Bragg for the first time that his fare would be the regular twenty dollars, instead of the thirteen dollar fare which Bragg testified had been originally agreed upon. At that time and place Gullett drove the taxi-cab over to the side of the road and on a side road to West Virginia Route No. 12, which was near the home of defendant's witnesses, George Chapman and Mrs. Dooley Smith, in Lincoln County. As a result of the differences between the two occupants of the car, they engaged in a fist fight at the rear of the automobile, while it was parked on the side road. Thereafter the two got back into the car, according to Bragg, when suddenly Gullett struck Bragg across the face. Thereupon Bragg in a fit of passion and anger drew the gun from his pocket and shot Gullett in the head. Becoming frightened, Bragg felt the deceased's pulse to determine whether he was still alive, and after ascertaining that Gullett was dead, he drove the taxi-cab down the highway toward Charleston, and stopped at a point approximately three miles from the Coal River Bridge in Kanawha County, where he removed Gullett's body from the taxi-cab and threw it over an embankment. Thereupon, so Bragg testified, he took thirteen dollars from Gullett's shirt pocket his billfold and identification cards, and proceeded to drive the taxi-cab to the City of Charleston. Upon arriving in Charleston, Bragg parked the taxi-cab behind the Parkette Recreation Center on the west side of Charleston, where it was later discovered by the Charleston police. He then went to the Dupont Hotel in Charleston, where he registered under the name of "Robert Hights", but he remained at this hotel only a short time. Later the same night, Bragg registered at the Worthy Hotel, also in Charleston, where he remained until three or four o'clock on the day following the fatal shooting, November 9, 1953, when he boarded a bus and rode to Marmet, a small municipality a short distance east of the city limits of Charleston. There Bragg boarded another bus which took him to the City of Winston-Salem, North Carolina. From Winston-Salem Bragg took another bus for New York City, where, using Gullett's discharge papers, he reenlisted in the army under the name of the deceased Robert Gullett, and obtained from the army a few days later the reenlistment pay which would have been due to Robert Gullett had he not been killed and had he reenlisted in *696 the army. He remained in the army only a few days, when he left without leave and went to Fort Myers, Florida, where his family then resided, and where he was arrested a few minutes after his arrival.
The defendant Bragg is corroborated by the testimony of his witnesses, George Chapman and Mrs. Dooley Smith. Beyond peradventure this record discloses that the controversy between Bragg and Gullett, which resulted in the fatal shooting, occurred on a side road in Lincoln County within ear shot of Chapman and Mrs. Smith. Chapman testified that he had been living at his home near the side road for about forty-nine years; that on November 8, 1953, between nine and ten o'clock he observed an automobile being driven on the dirt road near his home; that while the automobile was there he heard voices engaged in a heated argument, and after a few minutes, during all of which time the argument continued, he heard the sound of a shot. He further testified that on the following day, or possibly a day later, he discovered a blot of blood on the road, near the tracks which the car had made. Mrs. Dooley Smith, who lived a short distance from the Chapman home, testified that she heard the shot that night about ten o'clock, and had seen blood on the side of the road. This witness, however, was not sure about the time as she did not have a clock.
Detective W. W. Fisher of the Detective Bureau of the Charleston Police Department, who, with Detective Silverman, discovered the abandoned taxi-cab on November 9, 1953, near the Patrick Street bridge, testified that an examination disclosed what appeared to be human blood on the inside of the car, and midway of the seat was an empty .25 caliber cartridge case. On the floor board on the left side of the taxi-cab, the officers found a shell, and on the left side there was a great deal of blood. The officers also found a spent bullet on the floor board of the taxi-cab on the left side near the bottom of the left door, just about where it would meet the frame of the car. Officer W. W. Fisher found a blood-coated jacket in the taxi-cab. On being recalled Fisher testified that he found the bloodcoated jacket in the back seat of the taxi-cab.
Apparently both men were sober during the afternoon of November 8, when they left the City of Logan for the City of Charleston. A chemical analysis of Gullett's blood, made after his death by Sergeant Shanholzer, a member of the West Virginia Department of Public Safety, who, the record discloses, had received a degree in chemistry at West Virginia University, and was thoroughly qualified in the analysis of both human and animal blood, disclosed that Gullett's blood contained no alcohol.
State's witness, Lilly Dale Reed, co-owner with her husband, Thurmond Reed, of the Guyan Taxi Company, testified that she saw both Gullett and Bragg during the course of Sunday afternoon, November 8, 1953, and had occasion to observe closely both men, as Gullett drove the cab from the stand on the trip to Charleston, with Bragg seated beside him in the front seat, and that neither man was under the influence of alcohol. In reference to Gullett the witness testified "I was close enough to him I would have known if he had anything to drink", and as to Bragg the witness testified catagorically that "He was sober"; and "I don't think he was drinking, I know he was not drunk because I had seen him several times before."
Thurmond Reed, the other owner of the taxi company, did not see Bragg on the Sunday afternoon he left Logan, but about four o'clock in the afternoon shortly before Gullett reported for work, witness checked with him the work of the previous week, and he testified that the amount which Gullett paid to him was satisfactory, and that Gullett was "perfectly sober as far as I could tell."
To like effect State's witness, Walter S. Hinchman, one of Gullett's fellow-drivers, testified that just about six, seven or eight minutes before Gullett left Logan with Bragg on the trip to Charleston, Gullett sat in the front seat of witness' taxi-cab "Just *697 sitting and talking", and this witness testified that Gullett was not drinking. "I was sitting right opposite him, and if he had been drinking I would have smelled it."
Mike Ghiz, another taxi-cab driver, testified that about four-thirty in the afternoon of November 8, he turned the taxi-cab he was driving over to Gullett, who drove witness home, and he testified that Gullett was sober at that time.
The threshold question is whether the venue of the case was established to lie in Kanawha County. Beyond peradventure Gullett received the fatal wound in Lincoln County, so venue would not lie in Kanawha County, unless Gullett's death occurred in that county. Under Code, 61-11-12, the venue for murder lies in the county where the fatal injury is inflicted, or, if death occurs in another county, venue also lies in such other county. Bearing on the question whether Gullett was alive when Bragg threw him over the embankment in Kanawha County, Bragg's statement to F. B. I. Agent Byers, introduced in evidence, differs sharply from his testimony at the trial. The statement relates that Bragg shot Gullett in the right temple, then jumped out of the taxi-cab and "ran up the road a little ways and I came back to the cab, then I went down to road and jumped over the bank and started to leave there that way, but I went back to the cab, and I went to the drivers side and pushed Gullett out from behind the drivers side, I believe he was alive at this time, because I could feel his muscles move * * *." The defendant then says in his statement that he drove to Alum Creek, and then drove for about three miles and stopped along side of the road, where he pulled Gullett out of the taxi-cab and threw him over the bank. But upon trial Bragg testified that he could not find that Gullett had any pulse beat when he threw his body over the bank.
Bearing, however, most significantly on the question of venue is the testimony of Dr. W. Putschar, a qualifiedpathologist of good reputation in his profession, who testified that he performed an autopsy on the body of Gullett on November 14, 1953, and on evidence of microscopic finding this witness testified that Gullett survived the fatal shot several hours, at a minimum of three hours and a maximum of probably six hours. This evidence bearing on the question as to the county in which venue of the case lies is sufficient for jury determination that Gullett, though shot in Lincoln County, died in Kanawha County, giving both counties venue of the case; and, the State having elected to try the defendant in Kanawha County, it should not be dismissed as a matter of law for lack of venue in Kanawha County.
Though the State prosecuted this case on the theory that the defendant shot Gullett in the commission and furtherance of a robbery, defendant's counsel proceeded on the defense theory that at the time of the homicide Bragg was so grossly intoxicated that he was incapable of entertaining wilful deliberation and meditation, when he fired the fatal shot. On this theory the defendant offered his instructions Nos. 19, 20, 21, and 22, which were refused by the trial court.
However, as the defendant himself was the only eyewitness to the shooting, and he took the witness stand in his own behalf, his cross-examination, bearing on the extent of his intoxication, if any, at the time Gullett was shot, is most significant.
That Bragg was definitely under the influence of alcohol on the Saturday night before he left Logan in Gullett's taxi-cab, appears clearly from defendant's examination and cross-examination. On that Saturday afternoon and evening he had drunk, according to his own testimony, about twelve dollars worth of beer, together with some whiskey, so that he had no recollection of loading the gun with which, he admits, he shot and killed Gullett, and not until he had bought the gun, he testified, did he become intoxicated so that, as he testified, "I didn't know what I was doing at 5:30 or 6:00 o'clock [evidently speaking of Saturday evening]." In this case, however, we are not concerned with Bragg's condition on the afternoon and evening of Saturday, *698 November 7, 1953. If the extent of Bragg's intoxication entered into this case as a defense, it is his condition at the time he left Logan in Gullett's taxi-cab about eight o'clock on Sunday evening, November 8, 1953, and during the course of the ride to Charleston. In this regard defendant testified on cross-examination in detail as follows:
"Q. You were not so intoxicated you did not know what you were doing when you started from Logan to Charleston? A. No, sir.
"Q. You knew exactly what you were doing? A. Yes, sir.
"Q. And you knew exactly what you were doing when you rolled this boy over the bank, didn't you? A. Yes, sir.
"Q. And you knew exactly what you were doing when you went through his shirt pocket and took out what money he had in there? A. Yes, sir.
"Q. And you knew exactly what you were doing when you searched his pockets and got his wallett, did you not? A. Yes, sir.
"Q. And you knew that he did not have any more money on him when you left him, did you not? A. No, sir.
"Q. You went through all his pockets, did you not? A. I did not.
"Q. You took the money changer off his belt? A. I didn't take it off his belt.
"Q. Did you see it? A. It was laying in the seat.
"Q. You knew exactly what you were doing when you took it and brought it with you? A. Yes, sir.
"Q. You knew exactly what you were doing when you hid his pocket book in a hotel room? A. Yes, sir.
"Q. And your purpose was to keep somebody from finding it? A. Yes, sir.
"Q. And you knew exactly what you were doing when you hid it? A. Yes, sir."
Provided an accused did not intentionally become intoxicated so as to prepare himself for the commission of the crime, intoxication of an accused is a defense to a charge of murder of the first degree, when the degree of intoxication is such as to render the accused incapable of premeditation and deliberation. See State v. Painter, 135 W.Va. 106, pt. 2 syl., 63 S.E.2d 86; State v. Corey, 114 W.Va. 118, 171 S.E. 114; State v. Lemon, 84 W.Va. 25, 99 S.E. 263. Under the facts portrayed by this record and the uniform holdings of this Court, the trial court properly refused defendant's instructions Nos. 19, 20, 21 and 22.
As the State prosecuted this case on the theory that the defendant killed Gullett in the commission of a robbery, certain parts of the record bear pertinently on that theory.
State's witness, Lilly Dale Reed, coowner of the Guyan Taxi Company, testified that on the afternoon of November 8, 1953, Gullett attempted to cash a check, which he had received as muster-out-pay as a former member of the armed forces, in the amount of one hundred dollars; and that he obtained the money on the check evidently before he went into the Wheel Cafe about four o'clock on Sunday afternoon with the defendant Bragg, Dolly Rice and Macie Welch. State's witness, Macie Welch, testified that while she, the Rice girl, Bragg and Gullett were sitting in a booth on that Sunday afternoon, Gullett took from his pocket a billfold, and counted five twenty-dollar bills; that Gullett made no effort to conceal the money, but on the contrary laid the money on the table in the booth, while all four were sitting at the table; and that he then picked the money up, put it back into his billfold and put the billfold back in his pocket.
The defendant on the contrary testified that at the time he entered Gullett's taxi-cab, he did not know how much money Gullett had with him; and that while defendant *699 was in the booth with Gullett, Dolly Rice and Macie Welch, he did not see Gullett exhibit the five twenty-dollar bills.
Because it appears from State's instruction No. 2, defendant's instruction No. 7, and the argument of counsel made a part of the record by bill of exceptions No. 2, this case was prosecuted on the theory that the defendant shot and killed Gullett in the commission of a robbery, the question whether the killing was a "wilful, deliberate and premeditated" killing under Code, 61-2-1, does not enter into this case. It is to be noted that the statute, Section 1, throughout the first paragaph, which defines murder of the first degree, is in the alternative. It provides that "Murder by poison, * * * or by any wilful, deliberate and premeditated killing, or in the commission of, or attempt to commit, * * * robbery * * * is murder of the first degree." We are, therefore, not at liberty in the appraisement of this record to apply the rule stated in State v. Boggs, 129 W.Va. 603, 42 S.E.2d 1, to the effect that even the intentional use of a deadly weapon in the commission of a homicide is not necessarily malicious, and hence not murder within Code, 61-2-1, but such use of a deadly weapon is simply an element from which the jury may infer malice. The correct rule, approved in State v. Boggs, supra, is stated in State v. Bowles, 117 W.Va. 217, 221, 185 S.E. 205, 207: "Malice and intent could be inferred by the jury from the defendant's use of a deadly weapon, under circumstances which they did not believe afforded him excuse, justification or provocation for his conduct." (Italics supplied.) See also State v. Shelton, 116 W.Va. 75, pt. 2 syl., 178 S.E. 633.
The defendant purchased a box of shells and the .25 caliber automatic pistol from Carsons Auto Store, a sporting and fishing equipment, and automobile accessories establishment in Logan, some time in the late afternoon or early evening of November 7, 1953. That defendant did not make the purchase and arm himself with the pistol with the intent at the time of the purchase of using the pistol for the purpose of killing or robbing Gullett clearly appears from this record. State's witness, Donald P. Jacobson, the store manager, testified that on the evening of November 7, 1953, Bragg came into the Carsons Autom Store, and purchased the pistol for $37.95, and the shells for $2.50, for which he made a down payment of two dollars. But the witness Jacobson testified on cross-examination that three to five weeks before the pistol was purchased, Bragg came into the store and talked with him about buying a .25 caliber pistol, which the store did not then have in stock, and that the witness told Bragg that when he obtained a gun of the kind about which Bragg had inquired, he would notify him. Bragg testified that about five-thirty or six o'clock in the evening of November 7, 1953, he went to the Collins Credit Clothing Company in Logan, and bought his friend, Dolly Rice, a coat, and that on the way back he passed the Carsons Auto Company, and "saw this fellow", evidently referring to Jacobson, standing in or in front of the store, waving for him to come in. He testified that about two months previously he went to the Carsons store to pay something on an account which his father had with that store, and on that occasion he "asked if there was any particular gun I wanted, and I said I wanted a pearl-handled pistol. He said he would order it for me, and let me know when it came in. * * * That evening when he waved for me to come in there, I went in * * *. He said, `I have got that gun you ordered.' I looked at the gun and it was a .25 caliber automatic pistol, chrome finish. He asked me if I wanted it, and I told him I didn't believe so, that I didn't have the money. * * * I told him I had a couple of dollars, and he said, `Give me that and you can pay the rest later.'" Then the witness testified that Jacobson "throwed in a box of shells, .25 caliber, fifty in a box, and I wrapped up the gun and went into the Wheel Cafe", where he met Dolly Rice and Macie Welch, and gave the former the coat. He sat down in the cafe, "Dollie and I", drinking beer and whiskey, until he became so intoxicated that he did not know what time he left the cafe.
During the course of defendant's cross-examination by the Prosecuting Attorney of *700 Kanawha County, the following colloquy took place:
"Q. You knew you had no right to carry this gun without a State license? A. That is true.
"Q. You did not have any State license? Objection; overruled; exception. A. No, sir.
"Mr. Pettry: We move to declare a mistrial. Our ground is that an accused or defendant cannot be questioned if he had a license to carry a gun or not. (Overruled; exception.)"
Neither this evidence, defendant's objection thereto, the trial court's ruling thereon, the court's ruling on defendant's motion for a mistrial, nor the exceptions of defendant's counsel to the trial court's ruling, was specifically set forth in defendant's motion that the trial court set aside the verdict of the jury and grant defendant a new trial; nor does the record contain a special bill of exceptions, which shows the evidence, the objection of defendant's counsel thereto, the ruling of the trial court in admitting the evidence, the trial court's ruling on defendant's motion for a mistrial, or the exceptions to the trial court's rulings, though the evidence, the defendant's objection thereto, the trial court's ruling in admitting the evidence, the motion of defendant's counsel that a mistrial be declared, the trial court's ruling on the motion, and the exceptions of defendant's counsel to the trial court's rulings were included in a general bill of exceptions. On that basis it is asserted by the attorney general that if the questions and answers thereto are objectionable and prejudicial so as to constitute reversible error, such error cannot be considered here, because of the rulings of this Court in Ritz v. Kingdon, 139 W.Va. , 79 S.E.2d 123; State v. May, 111 W.Va. 118, 160 S.E. 918; and State v. McNemar, 108 W.Va. 237, 151 S.E. 176.
To defendant's assignment of error that the trial court erred in admitting the evidence objected to and in overruling defendant's motion for a mistrial, the attorney general counters: (1) That the alleged error in admitting the testimony over objection and in overruling defendant's motion for a mistrial cannot be considered on this writ of error under the holding of this Court in point 3 of the syllabus of Ritz v. Kingdon, supra, because the alleged error has not been specifically made a ground in support of defendant's motion to set aside the verdict of the jury and grant defendant a new trial, or incorporated in a special bill of exceptions, showing the evidence objected to, the rulings of the trial court thereon and on defendant's motion for a mistrial, and the exceptions of defendant's counsel to the court's rulings; and (2) if the trial court erred in the particular regard assigned, the error was not prejudicial to the defendant under the holding of this Court in the case of State v. Foley, 128 W.Va. 166, 35 S.E.2d 854.
The principle enunciated in Ritz v. Kingdon, supra, and kindred cases, however, though jurisdictional, is in the final analysis procedural and technical. In a case such as the one at bar, in which the life of the defendant is at stake, the rule should not be applied by this Court so as to withhold from this Court its duty to see that every defendant in a criminal case has a fair trial.
We are, therefore, persuaded, in the interests of justice to reappraise the holding of this Court in the Ritz case, and to reexamine the pertinent statutes governing the instant question of appellate procedure, and in this connection to consider carefully the record made in the case at bar.
The petition filed in the Circuit Court of Kanawha County, praying for a writ of error and supersedeas to the judgment of conviction entered by the Intermediate Court of Kanawha County, on March 3, 1954, contains the following assignments of error:
"1. In permitting the Prosecuting Attorney to inquire of the defendant, Malcolm Cameron Bragg, whether or not he, the said Malcolm Cameron *701 Bragg, had a license to carry the death weapon, a pistol, and in requiring the said Bragg to answer said question over the objection made by defendant's counsel and which said answer by the defendant was that he did not have a license to carry the pistol at the time of the fatal shooting.
"2. In refusing the defendant's motion for a new trial after the Prosecuting Attorney inquired of the defendant, Malcolm Cameron Bragg, whether or not he had a license to carry the pistol at the time of the fatal shooting and after the said Bragg had answered that he did not have a license to carry the pistol and after the question concerning the pistol had been objected to by defendant's counsel."
And the petition of the defendant, praying for a writ of error and supersedeas to the judgment of the Circuit Court of Kanawha County, filed in this Court on October 4, 1954, contains, inter alia, the two following assignments of error:
"1. The trial Court erred in permitting the Prosecuting Attorney to inquire of the defendant, Malcolm Cameron Bragg, whether or not he, the said Malcolm Cameron Bragg, had a license to carry the death weapon, a pistol, and in requiring the said Bragg to answer said question over the objection made by defendant's counsel and which said answer by the defendant was that he did not have a license to carry the pistol at the time of the fatal shooting.
"2. The trial court erred in refusing the defendant's motion for a new trial after the Prosecuting Attorney inquired of the defendant, Malcolm Cameron Bragg, whether or not he had a license to carry a pistol at the time of the fatal shooting and after the said Bragg had answered that he did not have a license to carry the pistol and after the question concerning the pistol had been objected to by defendant's counsel."
The former petition, that is the petition praying for a writ of error and supersedeas to the judgment of the intermediate court, filed in the circuit court, was not contained in the printed record, but was found in the original record. The petition for a writ of error and supersedeas to the judgment of the Circuit Court of Kanawha County, filed in this Court, is contained in the original record.
The printed brief filed in this Court by W. Hayes Pettry, Esq., and Emerson W. Salisbury, Esq., on behalf of the defendant Bragg, contains, among others, the two following grounds of error:
"I The trial court erred in permitting the prosecuting attorney to inquire of the defendant Malcolm Cameron Bragg whether or not the said Malcolm Cameron Bragg had a license to carry the death weapon, a pistol, and required the said Bragg to answer said question over the objection of defendant's counsel, and which said answer by the defendant was that he did not have a license to carry said pistol.
"II. The Trial Court erred in refusing the defendant's motion for a mistrial when the prosecuting attorney inquired of Malcolm Cameron Bragg whether or not he had a license to carry the pistol and Bragg answered that he did not have a license to carry the pistol, when the said question by the prosecuting attorney had been objected to by the defendant's counsel."
Thus it appears from the petition for the writ of error and supersedeas to the judgment of the intermediate court filed in the Circuit Court of Kanawha County, the circuit court acting as an appellate court, that the circuit court had its attention called to the alleged errors of the intermediate court in admitting the evidence bearing on Bragg's license to carry the pistol with which he shot Gullett, and in this Court by the assignments of error contained in the petition for a writ of error and supersedeas to the judgment of the Circuit Court of Kanawha County, as well as in the printed briefs, the attention of this Court *702 was specifically directed to the alleged errors in admitting the evidence objected to.
However, because the alleged errors of the Intermediate Court of Kanawha County in the admission of the evidence bearing on Bragg's license to carry the weapon with which he shot Gullett, the objection of defendant's counsel thereto, and the trial court's ruling thereon, neither was specifically made a ground of a motion to set aside the verdict and grant a new trial, nor incorporated in a special bill of exceptions, which shows the evidence objected to and the ruling of the trial court in admitting the evidence, the alleged errors would be waived under the ruling of this Court in point 3 of the syllabus of Ritz v. Kingdon, supra, unless the motion of defendant's counsel for a mistrial, interposed immediately upon the admission of the evidence over defendant's objection, which contains the express ground that the "defendant cannot be questioned if he had a license to carry a gun or not" will serve to take this case out of the rule contained in point 3 of the syllabus of the Ritz case.
We, however, after a further examination of the pertinent statutes, find that Code, 56-6-37, in the last sentence thereof, contains the following provision: "But nothing in this or the previous section [Code, 56-6-36, which provides for a certificate in lieu of a bill of exceptions, and Code, 56-6-37, which, inter alia, provides how the certificate in lieu of a bill of exceptions, or a bill of exceptions is to be considered, and that the instructions in the transcript are all to be presumed to have been given by the trial court] shall be construed as compelling the appellate court to notice or review any matter arising upon a specific exception noted in the transcript of the evidence and proceedings reported unless such exception be specifically pointed out in assignments of error, brief of counsel, or otherwise specifically brought to the attention of the court." (Italics supplied.) In the Revisers' note to this section it is stated that: "The final sentence is in accord with the views expressed in Hinton Milling Co. v. New River Milling Co., 78 W.Va. 314, 88 S.E. 1079", and in Ferguson v. Pinson, 131 W.Va. 691, 694, 50 S.E.2d 476, 478, this Court, citing Code, 56-6-37, said: "Even though matter should arise upon a specific exception noted in the record in an action at law it need not be noticed or reviewed by this Court unless such exception is specifically pointed out in assignments of error or brief of counsel or is otherwise specifically brought to the attention of the Court. Code 1931, 56-6-37."
As appears from the Revisers' note to Code, 56-6-37, the entire section was new; and as the final sentence of the section, as the Revisers' note suggests, was enacted in accord with the views expressed in Hinton Milling Co. v. New River Milling Co., supra, the holding of this Court in that case, as expressed in point 3 of the syllabus, bears most pertinently upon the question of appellate procedure in the case under consideration. Point 3 of the syllabus of the Hinton Milling Company case [78 W.Va. 314, 88 S.E. 1080] reads: "Where a bill of exceptions certifies all the evidence and shows in addition thereto the rulings of the trial court in admitting or refusing to admit evidence upon the trial, and the exceptions thereto taken at the time, this court will consider such exceptions without special bills of exceptions thereto, provided the particular questions are specified distinctly in the record on the motion for a new trial, or in an assignment of error, or brief of counsel in this court, so that this court may readily and safely find the particular questions or evidence to which the exceptions relate, but this court will not consider such exceptions without such specification, although the bill of exceptions certifying the evidence notes them." (Italics supplied.)
In point 3 of the Ritz case this Court held [79 S.E.2d 125]: "Alleged errors in the admission or the rejection of evidence, to which objection has been made in a trial court, are waived unless such evidence is specifically set forth as a ground of a motion to set aside the verdict and grant a new trial or unless it is incorporated in a special bill of exceptions which shows the evidence and the ruling of the court in *703 admitting or rejecting it." In point 4 of the syllabus of the Ritz case this Court held: "To the extent that the holding and statements in the opinions in Hinton Milling Company v. New River Milling Company, 78 W.Va. 314 [88 S.E. 1079]"; and a number of other cited cases, all of which, including the Hinton Milling Company case, were decided before the enactment of Code, 56-6-37, "are inconsistent or in conflict with the holding in point 3 of the syllabus in this case such holding is overruled and such statements are disapproved."
In arriving at its holding set forth in point 3 of the syllabus in the Ritz case, this Court cited many cases, only two of which, State v. Cruikshank, 138 W.Va. 332, 76 S.E.2d 744, and Isabella v. West Virginia Transportation Co., 132 W.Va. 85, 51 S.E.2d 318, were decided after the enactment of Code, 56-6-37.
In the Cruikshank case this Court cited former decisions of this Court, including the case of Hinton Milling Co. v. New River Milling Co., supra, "to the effect that errors not specified on a motion for a new trial or not the subject of a special bill of exceptions will be treated as waived and will not be considered by an appellate court." [138 W.Va. 332, 76 S.E.2d 748.]
In the case of Isabella v. West Virginia Transportation Co., supra, this Court did not carry into the syllabus the rule of appellate procedure set forth in point 3 of the syllabus in the Ritz case, but in the body of the opinion this Court stated [132 W.Va. 85, 51 S.E.2d 320]: "Although the improper admission of evidence is assigned in this Court as error, and defendant gave it as one of the grounds in support of its motion to set aside the verdict and grant a new trial, no special bill of exceptions is found in the record setting forth the objectionable evidence. Moreover, defendant in its brief fails to point out any specific part of the evidence as being objectionable." (Italics supplied.) Evidently the ruling in the Isabella case was prompted by the fact that the defendant by failing to point out in its brief any specific part of the evidence as being objectionable, held that the defendant waived in this Court its objection to the ruling of the trial court in admitting the allegedly objectionable evidence.
Since the decision of this Court in the Ritz case, the Court has decided only three cases involving the question as to how errors of a trial court in the admission or rejection of evidence, objected to, may be saved for appellate consideration. Crookshank v. Hall, 139 W.Va. , 80 S.E.2d 330; Alloy v. Hennis Freight Lines, Inc., 139 W.Va. , 80 S.E.2d 514; and State v. Davis, 139 W.Va. , 81 S.E.2d 95.
In Crookshank v. Hall, supra, unlike the case at bar, no part of the evidence having been made a part of the record by a proper bill of exceptions, or a certificate in lieu of a bill of exceptions, this Court refused to consider the alleged errors in the rulings of the trial court in refusing to admit evidence objected to and in admitting evidence over objection. In the case of Alloy v. Hennis Freight Lines, Inc., supra, this Court adopted verbatim the rule contained in point 3 of the syllabus in the Ritz case; and in the case of State v. Davis, supra, this Court again adopted the rule contained in point 3 of the syllabus in the Ritz case, and in support thereof cited the Ritz case, the case of Alloy v. Hennis Freight Lines, Inc., supra, and several other cases.
We are of opinion that the provisions of Code, 56-6-37, are binding upon this Court, and that the legislative intendment, as disclosed by the express words of the last sentence of Section 37, is clearly expressed so that this Court may and should consider alleged errors arising on the rulings of a trial court in the admission or rejection of evidence objected to, where alleged errors in the admission or rejection of evidence, to which objection has been made in the trial court, are specifically set forth as a ground of a motion to set aside the verdict and grant a new trial; or incorporated in a special bill of exceptions; or are incorporated in the assignments of errors contained in the petition for a writ of error; or set forth in the brief of counsel; or otherwise specifically brought to *704 the attention of the appellate court. This holding requires this Court to disapprove points 3 and 4 of the syllabus of Ritz v. Kingdon, supra, and adopt the holding of this Court in point 3 of the syllabus of the case of Hinton Milling Co. v. New River Milling Co., supra, and to the extent the holdings and statements contained in the opinions of this Court in the cases of State v. Cruikshank, supra, and Isabella v. West Virginia Transportation Co., supra, cited in the Ritz case in support of the holding therein, which cases were decided after the enactment of Code, 56-6-37, and the cases of Crookshank v. Hall, supra; Alloy v. Hennis Freight Lines, Inc., supra; and State v. Davis, supra, decided after the decision in the Ritz case and after the enactment of Code, 56-6-37, are inconsistent or in conflict with the instant holding of this Court, such holding is overruled and such statements are disapproved.
To the extent also that the holding and statements in the opinions in Haldren v. Berryman, 109 W.Va. 403, 155 S.E 125; Graner v. Boring, 105 W.Va. 505, 143 S.E. 232; Stewart v. Pollack-Forsch Company, 105 W.Va. 453, 143 S.E. 98; Tuggle v. Belcher, 104 W.Va. 178, 139 S.E. 653; Draper v. Mercer Hardware & Furniture Company, 104 W.Va. 144, 139 S.E. 645; State v. Henderson, 103 W.Va. 361, 137 S.E. 749; State v. Male, 103 W.Va. 355, 137 S.E. 751; State v. John, 103 W.Va. 148, 136 S.E. 842; Roberts v. Lykins, 102 W.Va. 409, 135 S.E. 388; Dransfield v. Boone-Armstrong Motor Company, 102 W.Va. 370, 135 S.E. 286; Tredway v. New River & Pocahontas Consolidated Coal Company, 102 W.Va. 135, 135 S.E. 253; Proudfoot v. Pocahontas Transportation Company, 100 W.Va. 733, 132 S.E. 746; Trippett v. Monongahela West Penn Public Service Company, 100 W.Va. 319, 130 S.E. 483; State v. Noble, 96 W.Va. 432, 123 S.E. 237; Moorefield v. Lewis, 96 W.Va. 112, 123 S.E. 564; Guyandotte Coal Company v. Virginian Electric & Machine Works, 94 W.Va. 300, 118 S.E. 512; State v. Jones, 77 W.Va. 635, 88 S.E. 45; Bartlett v. Bank of Mannington, 77 W.Va. 329, 87 S.E. 444; Angrist v. Burk, 77 W.Va. 192, 87 S.E. 74; Hill v. Norton, 74 W.Va. 428, 82 S.E. 363, Ann.Cas.1917D, 489; Ireland v. Smith, 73 W.Va. 755, 81 S.E. 542; State v. Henaghan, 73 W.Va. 706, 81 S.E. 539; State v. Bingham, 42 W.Va. 234, 24 S.E. 883; Halstead v. Horton, 38 W.Va. 727, 18 S.E. 953; Gregory's Adm'r v. Ohio River Railroad Company, 37 W.Va. 606, 16 S.E. 819, also cited in the Ritz case in support of point 3 of the syllabus thereof, are inconsistent or in conflict with the holding in this case, such holding is overruled and such statements are disapproved.
In the Ritz case this Court overruled the holding and the statements contained in the opinions in the case of Hinton Milling Co. v. New River Milling Co., supra, and the following cases: Bond v. National Fire Insurance Company, 77 W.Va. 736, 88 S.E. 389; Walters v. Appalachian Power Company, 75 W.Va. 676, 84 S.E. 617; Parr v. Howell, 74 W.Va. 413, 82 S.E. 126; Wright v. Ridgely, 67 W.Va. 319, 67 S.E. 787; Fuller v. Margaret Mining Co., 64 W.Va. 437, 63 S.E. 206; McClanahan v. Caul, 63 W.Va. 418, 60 S.E. 382; Williams & Davisson Company v. Ferguson Contracting Company, 60 W.Va. 428, 55 S.E. 1011; Foley v. City of Huntington, 51 W.Va. 396, 41 S.E. 113; Bodkin v. Arnold, 48 W.Va. 108, 35 S.E. 980; Kay v. Glade Creek & Raleigh Railroad Company, 47 W.Va. 467, 35 S.E. 973; and McDodrill v. Pardee & Curtin Lumber Company, 40 W.Va. 564, 21 S.E. 878, to the extent that such holding and statements are inconsistent or in conflict with the holding of this Court in point 3 of the syllabus of the Ritz case. To the extent, and to the extent only, that the holding and statements in the opinions in the last-mentioned cases are consistent with the holding of this Court in this case and in point 3 of the syllabus of Hinton Milling Co. v. New River Milling Co., supra, such holdings are reinstated and such statements contained in the opinions of this Court in those cases are approved.
We are therefore at liberty to consider whether the Intermediate Court of Kanawha *705 County committed reversible error: (1) In permitting the prosecuting attorney to inquire of the defendant Bragg, whether he, Bragg, had a license to carry the pistol with which he shot Gullett, and in requiring the defendant to answer the question, over objection made by defendant's counsel, which answer was to the effect that the defendant did not have a license to carry the pistol at the time of the fatal shooting; (2) in refusing the motion of defendant's counsel made at the time the testimony was admitted, over objection, that the court grant a mistrial, which motion was based specifically upon the admission of the allegedly erroneous ruling of the trial court on the admission of the evidence objected to; and (3) whether the trial court in refusing defendant's motion that the verdict of the jury be set aside and a new trial awarded.
Even if the ruling of this Court in point 3 of the syllabus of the Ritz case remained undisturbed, the motion of defendant's counsel for a mistrial, specifying the objectionable evidence as a ground therefor, is an additional reason why this Court should consider the alleged error in the admission of the evidence bearing on the question whether Bragg had a license to carry the pistol with which he shot Gullett.
The motion for a mistrial was made by counsel for the defendant immediately following the ruling of the trial court in admitting the evidence objected to. Then and there the trial court was informed of the possible error in the admission of the evidence, and the court had full and ample opportunity to pass upon the question of the admissibility of the evidence, which the trial court did adversely to the defendant. The motion for a mistrial made, as it was during the course of the trial before the jury had rendered its verdict and before the judgment of conviction had been entered, directed the attention of the trial court to the question whether the evidence had been properly admitted. This even a special bill of exceptions would not do.
This holding renders moot the question whether, if the ruling of this Court in point 3 of the syllabus of the Ritz case remained undisturbed, the specification of error set forth in defendant's petition of March 8, 1954, in points 1 and 2 thereof, filed under Code, 51-7-7, praying that the trial court authorize and direct the court reporter to furnish a transcript of the evidence and proceedings of the trial court without charge to the defendant for use in seeking an application for a writ of error to the Circuit Court of Kanawha County and to this Court, could be regarded as a special bill of exceptions within the meaning of the holding of this Court in the Ritz case.
If the defendant is guilty of the crime with which he is charged in this indictment, he is guilty of a cold-blooded, wilful murder. To say the least defendant has committed an act which is repugnant to all substantial and law-abiding citizens of this State; all the more reason why his trial should be conducted with the greatest decorum and with the strictest regard for the rights of the defendant. The judgment of conviction, however, based as it is upon the verdict of the jury, should not be reversed unless the overruling by the trial court of defendant's motion for a mistrial was prejudicial to the defendant. "`A judgment in a criminal case will not be reversed merely because of error committed by the trial court but only when the error has been prejudicial to the accused.' State v. Taylor, 130 W.Va. 74, 42 S.E.2d 549." Pt. 4, syl., State v. Justice, 135 W.Va. 852, 65 S.E.2d 743, 744.
It is contended by the attorney general in this regard that the case at bar should be distinguished from the decision of this Court in State v. Foley, 128 W.Va. 166, 35 S.E.2d 854, 855, in which this Court held in point 2 of the syllabus: "Though the privilege, afforded by West Virginia Constitution, Article III, Section 5, of not answering a question addressed to a witness, which, if answered, would tend to subject the witness to a criminal or penal liability, is personal to the witness, nevertheless it is reversible error for the trial court, over objection of counsel for the accused, *706 to require the question to be answered where the answer sought to be elicited is not relevant to the issue of defendant's guilt or innocence and is designed to prejudice the jury against the defendant."
True, in the Foley case there was substantial evidence that the defendant believed, and had reason to believe, that he was in danger of losing his life or suffering great bodily harm, and in that case in point 4 of the syllabus this Court held that a defendant may arm himself with a gun, notwithstanding he has no license to carry one, but in that case this Court specifically held in point 1 of the syllabus: "Where, in a trial for murder, allegedly committed with the use of a revolver, the accused voluntarily takes the witness stand in his own behalf, it is reversible error for the trial court, over objection of counsel, to permit counsel for the prosecution to inquire of and require the accused to answer, whether he had a license to carry a pistol at the time the alleged killing took place."
Though the element of self-defense entered into the Foley case and prompted this Court to hold that the defendant Foley in the circumstances portrayed by the record in that case had a right to arm himself for the purpose of self-defense, the vice in the question addressed to Foley, as disclosed by point 1 of the syllabus of the case, was that the objectionable question elicited an answer from Foley which was self-incriminating.
In State v. Friedman, 124 W.Va. 4, 18 S.E.2d 653; State v. Mullenax, 124 W.Va. 243, 20 S.E.2d 901; and State v. McMillion, 127 W.Va. 197, 32 S.E.2d 625, this Court held that a defendant in a criminal case who voluntarily becomes a witness in his own behalf may be required to state in response to questions propounded on cross-examination whether he has been convicted of other offenses. The decisions in those cases, however, were based upon the postulate that a question addressed to a defendant concerning a former conviction went to the witness's credibility, and in those cases the Court invoked the provisions of Code, 57-3-6, which provided that: "In any trial or examination in or before any court or officer for a felony or misdemeanor, the accused" if he "voluntarily becomes a witness he shall, as to all matters relevant to the issue, be deemed to have waived his privilege of not giving evidence against himself and shall be subject to cross-examination as any other witness * * *."
Though the element of self-defense, which was present in the Foley case, is not contained in this record, the fact remains that under Code, 61-7-1, it is a misdemeanor to carry a pistol without the license provided by statute, which is a crime other and different from the crime for which the defendant Bragg was indicted and tried, namely, murder.
Code, 57-3-6, must, and we so read it, be read with West Virginia Constitution, Article III, Section 5, which provides in part: "* * * nor shall any person, in any criminal case, be compelled to be a witness against himself * * *." This Court has guarded the rights of an accused under this constitutional provision to such extent that it has been held that the ruling of a trial court in a criminal case permitting the prosecuting attorney, over objection of the defendant, to comment before the jury upon the failure of the defendant to testify in his own behalf, violates West Virginia Constitution, Article III, Section 5, and constitutes reversible error. State v. Costa, 101 W.Va. 466, 132 S.E. 869; State v. Jones, 108 W.Va. 264, 150 S.E. 728. This Court has never departed from the principle that the accused in a criminal case is protected against compulsory self-incrimination. This principle was inherent in the common law, both in England and the Colonies, and was recognized in the Virginia Bill of Rights of 1776. It is applicable, in our opinion, to the instant case. For a learned and lucid discussion of the law of self-incrimination, see the address of Honorable Lant R. Slaven, President of the West Virginia Bar Association, at the Seventieth meeting of the association held in 1954, and, in particular, *707 see Volume 70, Annual Report of The West Virginia Bar Association, page 79.
Though the prosecuting attorney on cross-examination asked and the trial court required the defendant to testify that he had stolen his father's and brother's furniture, and sold it to a used furniture company for seventy-five dollars, which he appropriated, no objection was noted of record to this testimony, and though the prosecuting attorney should not have elicited the testimony from the defendant, the evidence, not being objected to, was not saved as error for the purpose of consideration by either the Circuit Court of Kanawha County, acting as an appellate court, or by this Court upon writ of error. An error in admission of evidence not objected to by the defendant is deemed waived by him. State v. Mayle, 136 W.Va. 936, 69 S.E.2d 212; State v. Files, 125 W.Va. 243, 24 S.E.2d 233.
Error is assigned to the trial court's ruling in giving, over defendant's objection, State's instruction No. 2. Defendant's counsel assert that this instruction does not adequately inform the jury as to its sole province under Code, 62-3-15, upon finding a defendant guilty of murder of the first degree, to determine whether the defendant shall be executed or confined to the penitentiary for life. The part of State's instruction No. 2, which defendant asserts is inadequate in that regard and misleading, is the part reading: "* * * if you believe from the evidence in this case beyond all reasonable doubt, that the deceased, Robert William Gullett, was shot and killed by the defendant, Malcolm Cameron Bragg, while he, the said Malcolm Cameron Bragg, was engaged in committing, or attempting to commit, a robbery upon the said Robert William Gullett, then you should find the defendant guilty then you should find the defendant guilty of murder of the murder of the first degree, to determine whether the defendant be punished by confinement in the penitentiary of this State for life or by execution, should you find him guilty of murder of the first degree, and further find that he be punished by confinement in the penitentiary you should find in your verdict. Should you find him guilty of murder in the first degree and find that he be punished by death your verdict then would be, `We, the jury find the defendant guilty of murder in the first degree as charged in the indictment.'"
While State's instruction No. 2 informs the jury that it is within its province to determine whether the defendant be punished by confinement in the penitentiary of this State for life or by execution, it does not measure up and conform to the strong and lucid language contained in Section 15 of the Code, that: "If such further finding [that the defendant be punished by confinement in the penitentiary] be not added to their verdict, the accused shall be punished with death, but, if added, he shall be punished by confinement in the penitentiary during his life."
In the recent case of State v. Loveless, 139 W.Va. , 80 S.E.2d 442, 450, this Court had under consideration an instruction, which properly defined murder of the first degree, and further read that: "`The Court further instructs the jury that murder in the first degree is punishable by death or confinement in the penitentiary of this State for life, as the jury shall find in their verdict.'" In point 3 of the syllabus of that case, this Court held: "In a case in which the jury may return a verdict of guilty of murder in the first degree, it is the mandatory duty of the trial court, without request, to instruct the jury that, in the event such a verdict is returned, they may further find that the accused be punished by confinement in the penitentiary and that, in the absence of such finding, a sentence of death must be pronounced by the court."
Equally strong language was used by this Court, setting forth the duty of a trial court to sentence a defendant to be executed where the jury has rendered a verdict of murder of the first dgree without recommendation of confinement in the penitentiary *708 for life, in point 2 of the syllabus of the case of State v. Goins, 120 W.Va. 605, 199 S.E. 873, which reads: "It is the duty of the trial court when a case is submitted to a jury so that their verdict may be guilty of murder in the first degree to instruct them that in the event they return that verdict they may further find that the accused be punished by confinement in the penitentiary, in which case he will be sentenced to life imprisonment, and that otherwise the accused will be punished with death."
And in the still earlier case of State v. Chaney, 117 W.Va. 605, 186 S.E. 607, this Court in the syllabus overruled the holdings of the Court bearing on the instant question in the cases of State v. Cobbs, 40 W.Va. 718, 22 S.E. 310; and State v. Beatty, 51 W.Va. 232, 41 S.E. 434, and held: "It is the duty of the trial court, in prosecution for murder, to inform the jury, without request, of their authority under Code 1931, 62-3-15, to determine whether the accused, if found guilty of murder in the first degree, shall be punished by death or confinement in the penitentiary for life. * * *"
The policy underlying the decisions of this Court in the Loveless, Goins and Chaney cases is based upon the mandatory provisions of Section 15 of the statute, and is firmly imbedded in the law governing the trial of criminal cases had under indictments charging the defendant with having committed murder of the first degree. That the trial court has the duty in a criminal case, in which a verdict of murder of the first degree may be rendered, to instruct the jury that if the verdict of the jury does not contain the finding that defendant be punished by confinement in the penitentiary, the court shall sentence the defendant to death, but, if such finding is added, the defendant shall be punished by confinement in the penitentiary during his life. This, in our opinion, State's instruction No. 2 did not do, nor is the inadequacy of State's instruction No. 2 supplied by any other instruction given by the trial court.
In view of the fact that this case must be retried, defendant's assignments of error based upon the trial court's refusal to continue the case and to grant a change of venue are moot.
Again it becomes the duty of this Court to caution the prosecuting attorneys of this State against the use of their positions in the trial of criminal cases by referring in their argument to the jury to matters which are extraneous to the record. In the case at bar the Prosecuting Attorney of Kanawha County in his argument to the jury told the jury how the killing of Gullett took place, when a careful review of this record discloses that there were no facts contained therein justifying the remarks of the prosecuting attorney.
In addressing the jury the Prosecuting Attorney of Kanawha County stated: "In my opinion Gullett was driving that taxicab, going along at a moderate rate of speed, thinking about nothing, and Bragg took that pistol and put it over at his temple and pulled the trigger in order to take the money off of him that he knew that he had. The defendant reached over, grabbed the steering wheel and put his foot on the brakes and stopped the car." That a prosecuting attorney in the trial of a criminal case has a quasi-judicial duty cannot be gainsaid. In the case at bar the prosecuting attorney had no right to make the statement to the jury above quoted. In doing so, even if there were no other error in the case at bar, his action in that regard would have constituted reversible error. State v. Graham, 119 W.Va. 85, 191 S.E. 884; State v. Hively, 103 W.Va. 237, 136 S.E. 862; State v. Jarrell, 76 W.Va. 263, 85 S.E. 525; Harold v. Commonwealth, 147 Va. 617, 136 S.E. 658; 5 M.J., Criminal Procedure, Section 65; 2 M.J., Argument and Conduct of Counsel, Sections 15 and 17.
For the foregoing reasons the judgments of the Intermediate Court and Circuit Court of Kanawha County are reversed, the verdict of the jury set aside, and a new trial awarded.
*709 Judgments reversed; verdict set aside; new trial awarded.
BROWNING, Judge (dissenting).
It is my opinion that this defendant received a fair and impartial trial, and I would affirm the judgments of the Intermediate and Circuit Courts of Kanawha County. Therefore, I respectfully dissent from the Court's decision.
Code, 51-1-4a, provides that this Court may from time to time prescribe, adopt, promulgate and amend rules relating to the practice of law, and the last paragraph of that section says: "When and as the rules of the court herein authorized shall be prescribed, adopted, and promulgated, all laws and parts of laws that conflict therewith shall be and become of no further force or effect to the extent of such conflict." The appellate procedure prescribed by Code, 56-6-37, was based upon the decision of this Court in Hinton Milling Co. v. New River Milling Co., 78 W.Va. 314, 88 S.E. 1079. The ruling in that case as to procedure has been, subsequent to the enactment of the last mentioned section, overruled by this Court. However, no rule contrary to that procedure has been promulgated and adopted by this Court, and the question of whether that specific act is necessary to supersede the statutory provision, and whether the adoption of such a rule has more effect than a decision of this Court, overruling the Hinton Milling Co. case, upon the point in issue, has given me considerable trouble. In view of the great conflict upon this question in the decisions of this Court during the past sixty-two years, as evidenced by the cases cited in the majority opinion, and in Ritz v. Kingdon, 139 W.Va. , 79 S.E.2d 123, this Court owes a duty to the Bench and Bar of this State to adopt a rule, in the manner provided by statute, by which all who are affected may be guided in the future as to this important appellate procedural question. However, it is my opinion that the question of whether the evidence, the objection thereto and the exception, regarding the carrying of an automatic pistol by the defendant, at and shortly before the homicide is properly here is inconsequential. It was not reversible error (1) to require the defendant to answer the questions propounded to him relative to whether he had a license to carry the pistol; (2) to give State's Instruction No. 2; or (3) to permit the prosecuting attorney, over objection, to make the statement quoted in the majority opinion in his closing argument to the jury. These points will be discussed in that order.
It is true that Article III, Section 5 of the West Virginia Constitution states: "* * * nor shall any person, in any criminal case, be compelled to be a witness against himself, * * *." The history of this protective guarantee in our Constitution and its development during the past eight centuries is interesting, and for a detailed discussion of it reference is made to the subject of "Privilege against Self-crimination", Wigmore on Evidence, Volume VIII, Third Edition, Pages 276 to 530. This defendant had the privilege of refusing to make a statement of any kind to the police officers, subsequent to his arrest, at his preliminary hearing before a justice of the peace, before the grand jury, or at his trial before a petit jury, and it would have been reversible error for such refusal to make a statement or to testify to have been mentioned to the jury at the trial. However, waiving the constitutional privilege, he voluntarily became a witness in his own behalf at the trial, and Code, 57-3-6, provides that: "In any trial or examination in or before any court or officer for a felony or misdemeanor, the accused shall, with his consent (but not otherwise), be a competent witness on such trial or examination; and if he so voluntarily becomes a witness he shall, as to all matters relevant to the issue, be deemed to have waived his privilege of not giving evidence against himself and shall be subject to cross-examination as any other witness; but his failure to testify shall create no presumption against him, nor be the subject of any comment before the court or jury by any *710 one." It becomes pertinent then to determine whether the matter about which the prosecuting attorney inquired, and the witness was required to answer, was "relevant to the issue". Wharton's Criminal Evidence, Vol. 1, Eleventh Edition, Section 346, states in part that: "The wellsettled rule that evidence of collateral crimes cannot be introduced on the trial of a homicide charge is subject to an exception where the collateral crime precedes, or is contemporaneous with, or a part of, the charge on trial and the circumstances surrounding the collateral crime are essential to prove or to explain the crime charged. * * *"
This case may be clearly distinguished from State v. Foley, 128 W.Va. 166, 35 S.E.2d 854. In my opinion, the first syllabus point of that case is too broad, although it may have been applicable to the facts in the Foley case. On the day prior to the commission of the homicide by Foley, he had been violently assaulted by the son of the deceased, and the evidence showed that the deceased encouraged the assault and made threats against Foley. On the following day, returning lawfully to the place where the original assault had occurred, he carried a revolver in the pocket of his overcoat. Another altercation developed between Foley, the deceased and others, and Foley shot and killed the deceased. Under the law of this State, Foley had a right to arm himself under the circumstances, even though he had no license to carry a revolver, and, therefore, he was probably prejudiced by requiring him to state that he did not have a license to carry the weapon when the court did not further instruct the jury that having been threatened, he had a right to arm himself, even though he had no State license to carry a revolver. In the Foley case, the sole defense interposed was that of self-defense. There was no such defense in this case. One of counsel for the defendant in his closing argument emphasized that fact by stating: "* * * You cannot shoot a man simply because he slaps you in the face. I could not stand before a jury and argue such a thing as that. It would be foolhardy because it is not the truth. It does not make common sense. We are not pleading selfdefense in this case. * * *"
The evidence shows that: the defendant purchased the pistol used in killing the deceased about fourteen or fifteen hours before the homicide occurred; at the same time he purchased a box of ammunition for the pistol; on the afternoon following the purchase of the revolver, he met the deceased, a taxicab driver, in a tavern in the City of Logan, and sat for a time with him and two young women drinking beer, at which time and place the deceased placed upon the table at which they were sitting, five twenty dollar bills, which the witness, Macie Welch, says were plainly visible to the defendant although the latter denied having seen the money; and, although the defendant had planned to travel by bus from Logan to Charleston, the fare for such transportation being approximately three dollars, he changed his mind, and employed the deceased to drive him to that place, the fare for a taxicab journey being twenty dollars, although defendant says deceased agreed to take him for thirteen dollars. Macie Welch further testified:
"Q. What did you talk about? A. He was standing at the bar and he ordered a 7-Up and it was about five minutes to 8:00 o'clock. I said, `Malcolm, your bus leaves at 8:00 o'clock.'
"Q. To where? A. To Charleston.
"Q. Why did you say that to him? A. He was supposed to catch that bus.
"Q. What did he say? A. He said, `Well, I don't know, I might get a taxi.'"
While defendant states that the deceased slapped him in an argument about the amount of the cab fare, he does not deny that at an isolated place between Logan and Charleston, he shot and killed the deceased with the pistol he had purchased the evening before, robbed the body of the deceased and took the money that was in *711 his moneychanger, rolled the body over an embankment, used the identification papers, which deceased had in his billfold, to enlist in the Army in New York City, under the name of the deceased, and secured thereby the additional sum of $288, to which deceased would have been entitled as re-enlistment pay. The State tried this case upon the theory that the homicide occurred during the commission of robbery, and the defendant built his case around the theory that robbery was only an afterthought, the homicide being due to the altercation which he and the deceased had regarding the taxicab fare from Logan to Charleston.
If error was committed, it was in the admission of testimony of a separate offense, not connected with the alleged crime for which defendant was on trial, and for which he had not been theretofore convicted. The rule is well established that when one is on trial for a particular offense, proof of his guilt of other offenses, wholly unconnected with that for which he is upon trial must be excluded. However, there are exceptions to the rule that are as well established, and as has been said "founded on as much wisdom and justice as the rule itself." This Court has held that Code, 57-3-6, requires an accused, who voluntarily becomes a witness in his own behalf, to state, in response to questions propounded on cross-examination, whether he has been convicted of other offenses, either felonies or misdemeanors, even when such offenses are unrelated to the charge being tried. State v. Friedman, 124 W.Va. 4, 18 S.E.2d 653; State v. Mullenax, 124 W.Va. 243, 20 S.E.2d 901; State v. Seckman, 124 W.Va. 740, 22 S.E.2d 374; State v. McMillion, 127 W.Va. 197, 32 S.E.2d 625; State v. Taylor, 130 W.Va. 74, 42 S.E.2d 549. These cases are authority for the fact that Code, 57-3-6, is not in conflict with Article III, Section 5 of the Constitution, if the evidence adduced is "relevant to the issue" being tried, even though they hold that the defendant is entitled to an instruction, if requested, that such evidence is to be considered by the jury only as it may affect the credibility of the defendant as a witness. Certainly this constitutional provision does not, on a charge of murder, prohibit the introduction of evidence of a collateral crime if the collateral crime precedes, or is contemporaneous with, or a part of, the charge on trial, and the circumstances surrounding the collateral crime are essential to prove the crime charged.
Under the State's theory, it was "relevant to the issue", to adduce any evidence at its command to show that the defendant, only a day previous to the homicide, procured a pistol for the purpose of committing robbery with it. The only way that that could be shown was by proving facts from which the jury could make reasonable inferences as to defendant's purpose in securing the gun. If the defendant had a State license to carry the weapon which he purchased, or because of threats of violence made against him, could have legally secured and carried upon his person a pistol such as was true in the Foley case, that was material to his defense, and the absence of such right was certainly material, and relevant, to the State's case.
Counsel for the defendant emphasized rather than minimized the criminal acts of the defendant from the time he was thirteen years of age, and both being able and experienced attorneys, perhaps such strategy was the best that could be used in their efforts to save the life of their client. One of them in his closing argument to the jury stated: "* * * He admitted things and told you about his life. Since he has been 13 years of age the `machine' has been working on him. I do not know what caused the poor fellow's mind to be in such a stage, whether it was his environment at home or not, but certainly something caused the machine to move." He further stated: "We have heard a lot of evidence here in this case from all the witnesses and we let it go in."; and "This case has been tried with but little objection on the part of the defendant. We wanted you to know the whole facts and to give you the whole story." The other *712 attorney defending the defendant in his closing argument said: "Of course Mr. Watts [the prosecuting attorney] will, in his able way, also tell you of the things Bragg did when he was a boy, and there is no denial of it. He will say to you that he had crooked dice and he stole money. He did it, and there is no denial of it. * * *"
After the defendant's background had been thus developed on direct examination, the prosecuting attorney was permitted to ask the defendant on cross-examination, without objection, about committing larceny as a juvenile; while on parole of having committed auto theft; of having been sentenced for a month and twenty-three days at hard labor by a martial court; of having received two sentences for felonies, apparently running concurrently, in the State of Virginia; of having violated parole by being drunk, as he admitted he was on the day before the homicide occurred; and of having sold and converted to his own use, certain furniture belonging to his father at a town in Ohio, two or three days before the homicide. With all of this evidence of the criminal background of the defendant placed before the jury, it is utterly inconceivable to assume that the defendant was prejudiced by being required to state that he did not have a State license to carry the pistol with which he killed the deceased. The jury knew quite well before they heard this testimony that this paroled convict from a Virginia penitentiary, with such an unsavory criminal record, could not have secured a license to carry a revolver in this State. Assuming the evidence to be inadmissible, it was harmless error to admit it. It has long been established by many decisions of this Court that where it clearly appears affirmatively that an error of the trial court could not affect the merits of the case, nor in any way be prejudicial to an accused, that this Court will not reverse the judgment of the trial court on the ground of such error. State v. Justice, 135 W.Va. 852, 65 S.E.2d 743; State v. Bragg, 105 W.Va. 36, 141 S.E. 400; State v. Evans, 94 W.Va. 47, 117 S.E. 885; State v. Murdock, 90 W.Va. 628, 111 S.E. 632; State v. Boggs, 87 W.Va. 738, 106 S.E. 47, 18 A.L.R. 1360.
In State v. Corey, 114 W.Va. 118, 171 S.E. 114, this Court held in Pt. 3 of the Syllabus, quoting from State v. Rush, 108 W.Va. 254, 150 S.E. 740, that: "`A verdict of guilty in a criminal case will not be reversed here because of error committed by the trial court, unless that error is prejudicial to the accused.'" That was a case in which the defendant was convicted of murder in the first degree, the judgment affirmed in this Court, and the defendant was subsequently executed. In the body of the opinion, this Court said: "It would be very unusual for a trial of the duration of this one to be carried through without error. Perfect trials are rare, if they ever occur. Upholding convictions does not depend upon the perfection of jury trials. It is not the province of courts of review to dissert records of trials for the purpose of determining whether there was any departure from technically correct procedure. An appellate court does not reverse for error in a trial unless it is reasonably evident that a party to the trial was prejudiced by reason of such error. Upon review of a state case, the appellate court's problem is to determine whether the convicted person has probably been prejudically affected by error in the trial. If there seems to have been no prejudice, the conviction must stand. Where, in a criminal case, under the whole evidence, the jury could not properly have returned any other verdict than that which it did return convicting the accused, errors not plainly prejudicial will be deemed inconsequential. * * *"
The doctrine of harmless error is deeply embedded in our jurisprudence, and this Court will not be alerted to discover loopholes in order that the guilty may escape their just deserts. Gilland v. Commonwealth, 184 Va. 223, 35 S.E.2d 130.
I think State's Instruction No. 2 meets the requirements of State v. Goins, 120 W.Va. 605, 199 S.E. 873, as well as State v. *713 Loveless, 139 W.Va., 80 S.E.2d 442, 450. After defining murder in the first degree, as applied to the facts in this case, it told the jury that: "* * * it is your province to determine whether the defendant be punished by confinement in the penitentiary of this State for life or by execution, should you find him guilty of murder of the first degree, and further find that he be punished by confinement in the penitentiary you should find in your verdict. Should you find him guilty of murder in the first degree and find that he be punished by death your verdict then would be, `We, the jury find the defendant guilty of murder in the first degree as charged in the indictment.'" The language in this instruction certainly informed the jury that should they find the defendant guilty of murder in the first degree, they were to determine whether his punishment would be confinement in the penitentiary for life, or death. While the language of the instruction does not specifically follow that of the statute, or the suggested instruction contained in the opinion of State v. Loveless, supra, there can be no doubt that it imparted to the jury the requisite information required in such cases. Furthermore, the jury was advised by counsel of the effect of their finding, as to the punishment of the defendant if they returned a verdict of murder in the first degree.
In the Loveless opinion, it was observed that arguments of counsel were not contained in the record, and the Court stated that even if they were, and if they did show that counsel had explained to the jury the effect of the different verdicts which they could have returned, that it would have been of no consequence, inasmuch as the jury "may disregard all that is said by counsel in argument, but they are not at liberty to disregard the law of the case as outlined to them in the court's instructions." Nevertheless, it may be observed in this case that in his closing argument, which is a part of the record, the prosecuting attorney told the jury that: "* * * If you think he is entitled to mercy and you find him guilty of murder in the first degree, your verdict would say, `We, the jury, find this man guilty of murder in the first degree and we further find that he be confined in the penitentiary.' If you think he deserves the death penalty then your verdict would be, `We, the jury, find the defendant guilty of murder in the first degree.' and say nothing more, then the court pronounces the maximum sentence on him."
It is not necessary to quote again the alleged improper remarks of the prosecuting attorney in his closing argument. They are contained in the majority opinion. However, the remarks of the prosecutor both before and immediately after the objection of the defendant, and the overruling of the objection by the court, clearly indicated that he was merely giving his opinion of what happened. The prosecutor, after the objection, stated: "I say that is my opinion, gentlemen of the jury. Gullett is not here to tell you what happened and you do not have to rely in this case on what Bragg tells you. You have as much right to draw your own conclusions as I have but I say that under all the facts and circumstances in this case it is my opinion that Bragg killed Gullett in order to take all the valuables he had off his person and to dispose of the body so that it would not be found * * *."
The defendant's version of the homicide was to the effect that while he and the deceased were seated in the front seat of the taxicab, deceased slapped defendant on the face, and that immediately thereafter defendant shot and killed deceased. The medical evidence shows that the bullet entered deceased's right temple and made its exit through the left temple at a point directly opposite its entrance, and there was expert testimony to the effect that the powder burns on deceased's right temple and in his brain were such that the shot was fired when the muzzle of the gun was in contact with the skin. It seems highly improbable, if not impossible, that such a wound could have been inflicted by the defendant upon the deceased if the *714 latter was in the act of or had just completed striking the defendant a blow across the face, and was, most certainly, observing the defendant, if not facing him, at the time the homicide occurred, according to the account of the defendant. The prosecuting attorney was only making a statement of reasonable inferences that could be drawn from the testimony, inferences that it was proper for the jury to draw, and certainly if the jury could do so, it was not improper for the prosecuting attorney to argue such inferences, when he emphasized that what he was saying was only his opinion.
A judgment of conviction should not be reversed, even for improper remarks of counsel to a jury which do not clearly prejudice the accused. State v. Shores, 31 W.Va. 491, 7 S.E. 413; State v. Shawn, 40 W.Va. 1, 20 S.E. 873; State v. Allen, 45 W.Va. 65, 30 S.E. 209; State v. Mooney and Friday, 49 W.Va. 712, 39 S.E. 657; State v. Simon, 132 W.Va. 322, 52 S.E.2d 725; State v. Painter, 135 W.Va. 106, 63 S.E.2d 86. It is the general rule that counsel may in argument express opinions which are based upon evidence, and this is true as to a prosecuting attorney on a trial for homicide. Sims v. Commonwealth, 134 Va. 736, 115 S.E. 382; 2 M.J., Argument and Conduct of Counsel, § 16.
This defendant received a fair and impartial trial by a jury of his peers, and their verdict has been approved by the Judge of the Intermediate Court of Kanawha County, and upon writ of error by the Judge of the Circuit Court of that county. Upon a verdict of murder in the first degree, it is within the province of the jury to fix the degree of punishment, and this jury determined from the evidence they heard that a merciless, mercenary murder had been committed, which was so brutal and heinous that no punishment, other than the maximum provided by the law of this State would fit the crime. In the absence of prejudicial error, no court has a right to disturb that finding, and I would not do so.
HAYMOND, Judge (dissenting).
As I emphatically disagree with the conclusion reached by the majority of the Court I dissent from the decision in this case which reverses the judgments of the Intermediate Court and the Circuit Court of Kanawha County, sets aside the verdict of the jury, and awards the defendant a new trial.
The reasoning by which the majority would justify its decision is, in my opinion, utterly unsound and completely unconvincing and is based on three palpably insufficient grounds. These grounds, which in view of the evidence are highly technical and entirely devoid of merit, include and challenge the rulings of the trial court: (1) in requiring the defendant to state that he did not have a license to carry the revolver with which he killed his victim; (2) in giving Instruction No. 2 offered by the State relating to a verdict which would find the defendant guilty of murder of the first degree; and (3) in permitting the prosecuting attorney in his closing argument to tell the jury how, in his opinion, the homicide occurred.
By many decisions of this Court, from the early cases of Danks v. Rodeheaver, 26 W.Va. 274, Searles v. Kanawha & Ohio Railway Company, 32 W.Va. 370, 9 S.E. 248, and Gregory's Adm'r v. Ohio River Railroad Company, 37 W.Va. 606, 16 S.E. 819, to the recent cases of Isabella v. West Virginia Transportation Company, 132 W.Va. 85, 51 S.E.2d 318; Ritz v. Kingdon, 139 W.Va. , 79 S.E.2d 123; Crookshank v. Hall, 139 W.Va. , 80 S.E.2d 330; Alloy v. Hennis Freight Lines, Inc., 139 W.Va. , 80 S.E.2d 514; and State v. Davis, 139 W.Va. , 81 S.E.2d 95, alleged errors in the admission or the rejection of evidence were held to have been waived, and for that reason could not here be considered or reviewed on writ of error, if such errors were not made the ground of a motion to set aside a verdict and grant a new trial or were not incorporated in a special bill of exceptions which shows the evidence and the ruling of the court upon *715 such evidence, even though all the evidence is made a part of the record by a general bill of exceptions.
The evidence which the majority holds was improperly admitted to the prejudice of the defendant, as indicated in the majority opinion, consisted of these two questions propounded to the defendant and these two answers: "Q. You knew you had no right to carry this gun without a State license? A. That is true. Q. You did not have any State license? A. No, sir." This evidence, which was the basis for the motion of the defendant for a mistrial, was not specified as a ground of the motion of the defendant to set aside the verdict and to grant him a new trial and was not incorporated in any special bill of exceptions. The admission of the evidence and the denial of the motion to declare a mistrial were never specifically called to the attention of that court before it entered judgment upon the verdict of guilty of murder of the first degree without recommendation and imposed upon the defendant the penalty of death by electrocution. Thus the trial court was not given the opportunity, expressly required by many decisions of this Court, to review or reconsider its action in admitting the evidence and in overruling the motion to declare a mistrial.
In this connection it is well to repeat, though to do so is now utterly futile in the case at bar, this pronouncement of Judge Brannon in Gregory's Adm'r v. Ohio River Railroad Company, 37 W.Va. 606, 16 S.E. 819: "After a trial is over, it is not simply a matter of fairness to the judge, but one vitally concerning the administration of justice in avoiding error and appeals, and consequent protraction of litigation, that there should be opportunity to review the points passed upon in the trial. The motion for a new trial affords this opportunity. It is the halting place for review." (Emphasis supplied).
These alleged errors were first specifically mentioned in a pauper's affidavit filed by the defendant in the trial court on March 8, 1954, five days after the entry by it of the final judgment. They were subsequently incorporated in the petition of the defendant to the circuit court for a writ of error to the judgment of the intermediate court and in his petition to this Court for a writ of error to the judgment of the circuit court, and they were also specified in the brief of his attorneys filed in this Court. Thus it appears that the intermediate court did not have these alleged errors properly presented to it until after the entry of its final judgment and they were not properly presented to the circuit court by the record before it upon its consideration of the writ of error which it granted to the judgment of the intermediate court. The same situation existed, with respect to the record, in the consideration of this case upon the writ of error granted by this Court.
In Ritz v. Kingdon, 139 W.Va. , 79 S.E.2d 123, the opinion in which was concurred in by all four of the present members of this Court who participated in the decision, this Court considered at length the procedure required for the consideration by this Court of alleged errors committed by a trial court in the admission or the rejection of evidence in cases in which the parties are entitled to a trial by a jury, for the purpose of clarifying the procedure and removing certain inconsistencies in some of its prior decisions on that question which had produced confusion in trial courts and uncertainty among members of the bar.
In the Ritz case, after an exhaustive review of its prior decisions on that point, in an effort to settle the question and inform trial courts and members of the bar of the required procedure, this Court adhered to and reaffirmed its holding in State v. Cruikshank, 138 W.Va. 332, 76 S.E.2d 744; Isabella v. West Virginia Transportation Company, 132 W.Va. 85, 51 S.E.2d 318; Haldren v. Berryman, 109 W.Va. 403, 155 S.E. 125; Graner v. Boring, 105 W.Va. 505, 143 S.E. 232; Stewart v. Pollack-Forsch Company, 105 W.Va. 453, 143 S.E. 98; Tuggle v. Belcher, 104 W.Va. 178, 139 S.E. 653; Draper v. Mercer Hardware & *716 Furniture Company, 104 W.Va. 144, 139 S.E. 645; State v. Henderson, 103 W.Va. 361, 137 S.E. 749; State v. Male, 103 W.Va. 355, 137 S.E. 751; State v. John, 103 W.Va. 148, 136 S.E. 842; Roberts v. Lykins, 102 W.Va. 409, 135 S.E. 388; Dransfield v. Boone-Armstrong Motor Company, 102 W.Va. 370, 135 S.E. 286; Tredway v. New River & Pocahontas Consolidated Coal Company, 102 W.Va. 135, 135 S.E. 253; Proudfoot v. Pocahontas Transportation Company, 100 W.Va. 733, 132 S.E. 746; Trippett v. Monongahela West Penn Public Service Company, 100 W.Va. 319, 130 S.E. 483; State v. Noble, 96 W.Va. 432, 123 S.E. 237; Moorefield v. Lewis, 96 W.Va. 112, 123 S.E. 564; Guyandotte Coal Company v. Virginian Electric and Machine Works, 94 W.Va. 300, 118 S.E. 512; State v. Jones, 77 W.Va. 635, 88 S.E. 45; Bartlett v. Bank of Mannington, 77 W.Va. 329, 87 S.E. 444; Angrist v. Burk, 77 W.Va. 192, 87 S.E. 74; Hill v. Norton, 74 W.Va. 428, 82 S.E. 363, Ann.Cas. 1917D, 489; Ireland v. Smith, 73 W.Va. 755, 81 S.E. 542; State v. Henaghan, 73 W.Va. 706, 81 S.E. 539; State v. Bingham, 42 W.Va. 234, 24 S.E. 883; Halstead v. Horton, 38 W.Va. 727, 18 S.E. 953; and Gregory's Adm'r v. Ohio Railroad Company, 37 W.Va. 606, 16 S.E. 819, that alleged errors in the admission or the rejection of evidence, to which objection has been made in the trial court, are waived unless such evidence is specifically set forth as a ground of a motion to set aside the verdict and grant a new trial or unless it is incorporated in a special bill of exceptions which shows the evidence and the ruling of the court in admitting or rejecting it.
In the Ritz case this Court also expressly overruled the holding and disapproved statements in the opinions in Hinton Milling Company v. New River Milling Company, 78 W.Va. 314, 88 S.E. 1079; Bond v. National Fire Insurance Company, 77 W.Va. 736, 88 S.E. 389; Walters v. Appalachian Power Company, 75 W.Va. 676, 84 S.E. 617; Parr v. Howell, 74 W.Va. 413, 82 S.E. 126; Wright v. Ridgely, 67 W.Va. 319, 67 S.E. 787; Fuller v. Margaret Mining Company, 64 W.Va. 437, 63 S.E. 206; McClanahan v. Caul, 63 W.Va. 418, 60 S.E. 382; Williams & Davisson Company v. Ferguson Contracting Company, 60 W.Va. 428, 55 S.E. 1011; Foley v. City of Huntington, 51 W.Va. 396, 41 S.E. 113; Bodkin v. Arnold, 48 W.Va. 108, 35 S.E. 980; Kay v. Glade Creek & Raleigh Railroad Company, 47 W.Va. 467, 35 S.E. 973; and McDodrill v. Pardee & Curtin Lumber Company, 40 W.Va. 564, 21 S.E. 878, to the extent that such holding and such statements in the opinions in those cases are inconsistent or in conflict with the holding in that case on that point.
Since the decision in the Ritz case this Court, in three recently decided cases, expressly adopted and approved the procedure specifically designated and required by the unanimous decision of the four participating judges in the Ritz case. In Crookshank v. Hall, 139 W.Va. , 80 S.E.2d 330, and in Alloy v. Hennis Freight Lines, Inc., 139 W.Va. , 80 S.E.2d 514, this Court held in point 2 of the syllabus in each case, in the language of point 3 of the syllabus in the Ritz case, that "Alleged errors in the admission or the rejection of evidence, to which objection has been made in a trial court, are waived unless such evidence is specifically set forth as a ground of a motion to set aside the verdict and grant a new trial or unless it is incorporated in a special bill of exceptions which shows the evidence and the ruling of the court in admitting or rejecting it." In the most recent case, State v. Davis, 139 W.Va. , 81 S.E.2d 95, the unanimous opinion contains this language: "The evidence objected to is not set forth in a special bill of exceptions, nor does the record show that it was specifically assigned as ground for a motion to set aside the verdict and grant a new trial. State v. McNemar, 108 W.Va. 237, 151 S.E. 176; Haldren v. Berryman, 109 W.Va. 403, 155 S.E. 125; State v. May, 111 W.Va. 118, 160 S.E. 918; Alloy v. Hennis Freight Lines, Inc., 139 W.Va. , 80 S.E.2d 514. See Ritz v. Kingdon, 139 W.Va., 79 S.E.2d 123, 137, where numerous cases are cited in support of this principle. * * *. In accordance with the cases cited above, we hold that the objections were *717 waived and will not be considered on this writ of error. State v. May, supra."
In Isabella v. West Virginia Transportation Company, 132 W.Va. 85, 51 S.E.2d 318, and in State v. Cruikshank, 138 W.Va. 332, 76 S.E.2d 744, the procedure specifically required in the later case of Ritz v. Kingdon, 139 W.Va. , 79 S.E.2d 123, was recognized and followed by this Court. In Isabella v. West Virginia Transportation Company, 132 W.Va. 85, 51 S.E.2d 318, this Court refused to consider an assignment of error in the admission of certain evidence which had been designated as a ground in support of a motion to set aside the verdict and grant a new trial but had not been incorporated in a special bill of exceptions or specifically mentioned in the brief of counsel in this Court; and in State v. Cruikshank, 138 W.Va. 332, 76 S.E.2d 744, in referring to the early case of Danks v. Rodeheaver, 26 W.Va. 274, this Court, citing a long list of cases beginning with State v. Thompson, 26 W.Va. 149, and ending with Closterman v. Lubin, 113 W.Va. 353, 167 S.E. 871, said: "Many subsequent decisions of this Court are to the effect that errors not specified on a motion for a new trial or not the subject of a special bill of exceptions will be treated as waived and will not be considered by an appellate court."
The Ritz case, in stating and approving the procedure required to enable an appellate court to consider alleged errors in the admission or the rejection of evidence did not create or announce any new, strange or unfamiliar rule of procedure; it simply reiterated and applied a rule which had been established and applied in the great majority of the cases decided by this Court in which the question of alleged errors in the admission or the rejection of evidence to which objection had been made in a trial court was presented and considered, and condemned and undertook to eliminate certain inconsistent and conflicting departures from the rule which had resulted from the decisions of this Court in a comparatively small number of cases.
The present decision of this Court, by a bare majority of three of its five judges, of the procedural question of appellate review of the action of a trial court in admitting or rejecting evidence to which objection has been made, removes the certainty and the stability sought to be restored and established by the Ritz case, and reestablishes confusion and uncertainty on this vitally important question of trial and appellate procedure which affects every trial court and every member of the legal profession in this State and is potentially present in every case in which a trial by a jury occurs. The action of the majority in overruling, on this point, the Ritz case, the five cited recent cases, and the long list of well considered prior cases referred to in point 6 of the syllabus, and the pronouncement in point 7 of the syllabus that the holding, on this point, of the cases there referred to, which had been expressly overruled, "is reinstated" and the statements in the opinions in those cases "are approved", is indeed a rare and, perhaps, unprecedented accomplishment which gives me grave concern.
I know of no other decision of this Court which summarily overrules a point of decision in so many cases and at the same time undertakes to reinstate and approve the decision in several other cases in which the holding on a particular point has been previously overruled. By its summary action in this case, the majority strikes a severe blow to and indicates slight or no regard for the universally recognized doctrine of stare decisis in pursuance of which courts generally abide by and adhere to their previously decided cases. This doctrine is a salutary principle which should not ordinarily be departed from unless considerations of public policy, which do not arise in this case, demand such departure. See Colonial Trust Company v. Flanagan, 344 Pa. 556, 25 A.2d 728; Hoyt v. Martense, 16 N.Y. 231.
The present decision, in my judgment, leaves the trial courts of this State and the members of the bar without any definite assurance concerning the future action of this Court in considering or refusing to *718 consider alleged errors in the admission or the rejection of evidence objected to in a trial court, upon the state of the record, in any particular instance. The procedure in a matter of this character should be stable, certain and firmly established and adhered to, and it should not depend, as it now seems to do, upon the view or the attitude which may be adopted by this Court at any time in each particular case in which it is asked to grant a review. The rule, which since the decision in the Ritz case, at least, until today had been recognized and applied, has now been broadened and extended to permit consideration and review by this Court of alleged errors in the admission or the rejection of evidence to which objection has been made in a trial court if assigned and specified for the first time in a petition to an appellate court for a writ of error, or if set forth in the brief of counsel in the appellate court, or if otherwise specifically brought to the attention of the appellate court. (Emphasis supplied). If this language, which in substance is contained in the majority opinion, means what it says, it will not be necessary, as heretofore, if there is a mere general objection to the admitted or rejected evidence in the trial court, to call the matter to its attention by designating the evidence objected to as a ground of a motion for a new trial or to call the alleged errors to its attention in any other manner, and specific objection may for the first time be presented to the appellate court by a petition to it for a writ of error, by assignment in the brief of counsel, or by the vague and indefinite method of "otherwise specifically" bringing it to the attention of that court, which may or could be held to mean a reference to the alleged errors in the oral argument of counsel in the appellate court.
Any of the three last mentioned methods of procedure would manifestly deprive the trial court of a fair or reasonable opportunity to review and correct the alleged errors which, until now, has always been afforded under penalty of waiver of the objection, and will necessarily result in appellate review in numerous cases in which such review would have been unnecessary and could have been avoided if the trial court had been given an opportunity to correct its ruling. I can not agree to the adoption or the recognition of a rule which permits or renders possible any such previously unheard of and presently intolerable innovation in the procedure employed in the orderly administration of justice.
Of course, I agree that if it clearly appears, and a court is convinced, that its prior decision of a question is manifestly wrong it may, and should, overrule any such decision. I realize also that no question is finally decided until it is rightly decided; but I can see no reason to invoke or resort to that doctrine in resolving the procedural question involved in this case. Justice has been administered satisfactorily throughout the years in this jurisdiction by the recognition and the application of the rule that alleged errors in the admission or the rejection of evidence objected to in a trial court are waived unless such evidence is specifically set forth as a ground of a motion to set aside the verdict and grant a new trial or unless it is incorporated in a special bill of exceptions. In the face of its many prior decisions, this Court now rejects the former limitations of the rule and unduly extends its scope and application. I would not in this case depart from the rule and I will not be responsible for the consequences which occur from its modification even though the defendant, who assails it and who has not but could have complied with it, as countless other litigants have been required to do, has been convicted and sentenced to die for committing the crime of murder of the first degree.
The majority would justify its action, in overruling its former holding in many cases and in extending the rule, by relying upon the provisions of Section 37, Article 6, Chapter 56, Code, 1931. That section, relating to appellate review, provides in part that "nothing in this or the previous section shall be construed as compelling the appellate court to notice or review any matter arising upon a specific exception noted in the transcript of the evidence and proceedings reported unless such exception be specifically pointed out in assignments *719 of error, brief of counsel, or otherwise specifically brought to the attention of the court."
It should be observed that this provision of the statute does not directly require an appellate court to notice or review any matter arising upon a specific exception noted in the transcript of the evidence and proceedings reported, but states that nothing in that section or the preceding section shall be construed to compel it to do so unless such exception be specifically pointed out in assignments of error, brief of counsel, or otherwise specifically brought to the attention of the court. (Emphasis supplied.) Though it may be argued that by implication an appellate court is required to notice or review a specific exception if it is pointed out in assignments of error, brief of counsel, or otherwise specifically brought to the attention of the court, the provision need not be given that construction, meaning or effect.
The cases of Ferguson v. Pinson, 131 W.Va. 691, 50 S.E.2d 476; Isabella v. West Virginia Transportation Company, 132 W.Va. 85, 57 S.E.2d 318; State v. Cruikshank, 138 W.Va. 332, 76 S.E.2d 744; Ritz v. Kingdon, 139 W.Va. , 79 S.E.2d 123; Crookshank v. Hall, 139 W.Va. , 80 S.E.2d 330; Alloy v. Hennis Freight Lines, Inc., 139 W.Va., 80 S.E.2d 514; and State v. Davis, 139 W.Va., 81 S.E.2d 95, were all decided after the enactment of the foregoing statutory provision and, though it was not discussed in any of them except the Ferguson case, in which it was referred to, it can not be presumed that this Court did not give consideration to the provision of the statute, or was unaware of its operation and effect, in recognizing and adhering to the rule that alleged errors in the admission or the rejection of evidence to which objection was made in a trial court are waived unless such evidence is specifically set forth as a ground of a motion to set aside the verdict and grant a new trial or unless it is incorporated in a special bill of exceptions, as it did in all the above cited cases except the Ferguson case in which the rule was not involved. On the contrary the effect of those decisions involving the foregoing rule was to regard the statutory provision as merely directory and not controlling on an appellate court. In view of the holding in the cited cases in which the rule was considered and adhered to, decided after the enactment of the foregoing statutory provision, that provision does not justify or support the action of the majority in rejecting the rule and in overruling, on that point, its many prior decisions in which the rule was recognized and applied.
To consider and review the alleged error in the admission of the evidence of the defendant that he did not have a license to carry the revolver with which he killed his victim, it was necessary to repudiate the rule of procedure reiterated and applied in the Ritz case and to overrule that case and the many other cited cases on that point and, having done so, the majority holds that the admission of the evidence constituted reversible error. It was unnecessary, however, to pursue that course to reverse the judgments in this case, for the majority, being convinced that the action of the trial court, in giving Instruction No. 2 offered by the State and in permitting the prosecuting attorney in his closing argument to tell the jury how, in his opinion, the homicide occurred, constituted reversible error, could have reversed the judgment of the trial court and the judgment of the circuit court on either or both of those grounds.
In the conclusion of the majority to reverse, on the ground that the admission of the evidence of the defendant that he did not have a license to carry the revolver constituted reversible error, I can not concur and with it I emphatically disagree for two controlling reasons. First, under the doctrine of stare decisis, the majority should have abided by its recent prior decisions and refused to consider or review the alleged error; and second, if the admission of the evidence constituted error it was harmless error which did not prejudice any right of the defendant and did not influence or affect the jury in arriving at its verdict of guilty of murder of the first degree without *720 recommendation. The introduction of this evidence did not inform the jury, for the first time, of the previous criminal acts of the defendant or acquaint it, for the first time, with his bad character. The defendant himself did this by his own testimony which was readily and willingly given by him without objection by his attorneys.
He testified that he had been committed to the West Virginia Industrial School at an early age for a minor infraction of the law; that he had received an "undesirable discharge" from the United States Army; that he had later reenlisted; that at one time while he was in the military service he had been absent from his duties without leave and had been court martialled and fined for that misconduct; that after his reenlistment, in November, 1948, he was charged with and convicted of the crimes of grand larceny and breaking and entering in the State of Virginia and sentenced to two three year terms in the Virginia Penitentiary; that after serving four and one half years of these two terms of confinement he was paroled; that he was on parole when he purchased the revolver with which he killed his victim; that he was on parole the day before the homicide when he drank heavily of intoxicating liquors, became intoxicated, and spent that night with an unmarried girl in a hotel in Logan; and that before leaving Roseville, Ohio, on his trip to Logan he had taken and sold, without the knowledge or the consent of his father and his brother, some furniture which he claimed belonged to him and to them; and that he used some of the money which he received from the sale in travelling to Logan.
The testimony of the defendant that he did not have a license to carry the revolver was not the only information which the jury had of that fact for it must have known that a convict on parole could not have obtained such license; and whether the defendant did or did not have a license to carry a revolver is of no consequence in the determination of his guilt or innocence of the crime with which he was charged and of which he was convicted. If the defendant had previously been issued a license to carry a revolver or, indeed, a license or a permit to arm himself with an arsenal of deadly weapons, any such license or permit would not confer upon him the right to use the revolver or any other firearm in the manner in which the defendant admitted that he used the revolver to kill his victim. Any such license or permit would constitute no defense whatsoever which would excuse or mitigate his murderous act.
The defendant testified that immediately before, at the time, and after, he killed Gullett he knew what he was doing; that on the trip from Logan to Charleston he and his victim quarrelled about the amount of the fare; that during the quarrel they left the taxicab and engaged in a first fight at the rear of the taxicab; that after they reentered it his victim, with the back of his hand, slapped the defendant across his mouth; that the defendant in a fit of passion and anger drew the revolver from his pocket and shot his victim in the head; that the defendant, being frightened, felt his victim's pulse to determine whether he was still alive and, after determining that his victim was dead, the defendant drove the taxicab for some distance, then stopped, removed the body from the taxicab, and threw the body over an embankment where it was found several days later; that the defendant took $13 from his victim's shirt pocket, his billfold and his identification cards; and that he then drove the taxicab to the City of Charleston where he abandoned it. The doctor who performed an autopsy on the body of the deceased testified that Gullett lived for a period of at least three hours after he was shot. This testimony is not controverted.
The evidence shows overwhelmingly and beyond all reasonable doubt that the defendant fatally shot his victim and robbed him before he died. In these circumstances whether the defendant shot and killed his victim wilfully, deliberately or with premeditation, or in a fit of angry passion, is legally unimportant for by Section 1, Article 2, Chapter 61, Code, 1931, murder in the commission of, or the attempt to commit, *721 arson, rape, robbery or burglary, is murder of the first degree.
Under the evidence, which established beyond all reasonable doubt the guilt of the defendant of the crime of murder in the commission of robbery, the only just and proper verdict which the jury could have returned, with or without the evidence that the defendant did not have a license to carry a revolver, was the verdict rendered by the jury of guilty of murder of the first degree without recommendation. The language used by this Court in its opinion in State v. Rush, 108 W.Va. 254, 150 S.E. 740, with reference to the evidence of guilt in that case, is applicable to the evidence in this case. That language is: "Neither bias, nor incompetent evidence, nor improper instruction was requisite in the least degree in this case to lead the jury to its verdict. The competent evidence compelled a return of guilty. Under that * * *, the jury could not properly have found any other verdict."
As already indicated the error, if any, in admitting the evidence of the defendant that he did not have a license to carry a revolver was harmless error which does not justify a reversal of the judgment of the trial court. This Court has consistently held that a judgment upon a verdict of guilty in a criminal case will not be reversed because of error committed by the trial court, unless such error is prejudicial to the accused. State v. Taylor, 130 W.Va. 74, 42 S.E.2d 549; State v. Justice, 135 W.Va. 852, 65 S.E.2d 743; State v. Smith, 119 W.Va. 347, 193 S.E. 573; State v. Corey, 114 W.Va. 118, 171 S.E. 114; State v. Rush, 108 W.Va. 254, 150 S.E. 740; State v. Dephenbaugh, 106 W.Va. 289, 145 S.E. 634; State v. Smith, 97 W.Va. 313, 125 S.E. 90; State v. Miller, 85 W.Va. 326, 102 S.E. 303; State v. Lane, 44 W.Va. 730, 29 S.E. 1020. See also State v. Painter, 135 W.Va. 106, 63 S.E.2d 86.
In support of its action in reversing the judgment of the trial court on the ground that the admission of the testimony of the defendant that he did not have a license to carry the revolver, the majority cites as authority the case of State v. Foley, 128 W.Va. 166, 35 S.E.2d 854, and the majority opinion contains the statement that a similar question propounded to the defendant Foley in that case elicited an answer from him which was self-incriminating. That statement, if applied to the defendant in this case, is merely gratuitous, for the defendant did not refuse to answer the questions on the ground that to do so would tend to incriminate him or, in fact, on any other ground. Of course, his failure to invoke the privilege against self-incrimination constituted a waiver of that privilege and he does not raise that question upon this writ of error.
In the Foley case the facts in connection with the homicide were materially different from the established material facts in connection with the slaying of Gullett by the defendant in the case at bar. In the Foley case the sole defense was that the defendant killed the decedent in self-defense and in support of that defense the defendant Foley testified that at the time he fired the shot which resulted in the death of his assailant Groves he believed that his life was in danger and that he was in danger of great bodily harm at the hands of Groves who had previously threatened the defendant. Here the defendant did not rely on self-defense and the evidence is entirely insufficient, as a matter of law, to support that defense.
The evidence on the issue of the guilt or the innocence of the defendant in the Foley case, though sufficient to support the verdict of guilty in that case, did not, as did the competent evidence in this case, require the return of a verdict of guilty. The defendant in that case, unlike the defendant in this case, did not inform the jury of any previous record of criminal conduct on his part and did not acquaint the jury with his own bad character. In that state of the evidence in the Foley case the admission of the testimony of the defendant that he did not have a license to carry a pistol was prejudicial to him. In that case this Court stated, in point 2 of the syllabus, that the question which elicited an answer from the defendant that he did not have such *722 license was designed to prejudice the jury against him. Here, as already pointed out, the admission of the evidence that the defendant did not have a license to carry the revolver with which he killed his victim, if error, was harmless error, which did not lead the jury to return its verdict of guilty of murder of the first degree and, in consequence, it did not prejudice any right of the defendant. Moreover, the testimony of the defendant that he did not have a license to carry the revolver was merely cumulative of the evidence of his previous criminal conduct which the defendant himself freely, voluntarily, and without objection by his attorneys, presented to the jury.
For the foregoing reasons the Foley case is distinguishable from the case at bar and the holding in that case that "Where, in a trial for murder, allegedly committed with the use of a revolver, the accused voluntarily takes the witness stand in his own behalf, it is reversible error for the trial court, over objection of counsel, to permit counsel for the prosecution to inquire of and require the accused to answer, whether he had a license to carry a pistol at the time the alleged killing took place.", is not in point and is not controlling in the decision of this case. Otherwise to apply the holding in the Foley case would mean that in every trial for murder or other crime involving personal violence in which the competent evidence is overwhelming, establishes the guilt of the accused beyond all reasonable doubt, and compels the return of a verdict of guilty, as in this case, the mere answer of a defendant that he did not have a license to carry a deadly weapon in response to a question calling for such answer, to which objection is made, would require the reversal of a judgment entered upon the verdict of guilty in every such case. I am unwilling, and the holding in the Foley case was not intended and does not require, that it be so applied.
There is no merit in the contention that the trial court erred in giving Instruction No. 2 offered by the State. The instruction properly defined murder of the first degree in accordance with the provisions of Section 1, Article 2, Chapter 61, Code, 1931. After telling the jury that if the jury believed from the evidence beyond a reasonable doubt that Gullett was shot and killed by the defendant while he was engaged in committing, or attempting to commit, robbery upon Gullett, the jury should find the defendant guilty of murder of the first degree, the instruction informed the jury that if the jury should so find it was the province of the jury to determine whether the defendant should be punished by confinement in the penitentiary of this State for life or by execution, that if the jury should find that the defendant should be punished by confinement in the penitentiary for life it should so find in its verdict, and that if it should find that he should be punished by death the verdict would be "We, the jury find the defendant guilty of murder in the first degree as charged in the indictment."
The instruction correctly stated the law applicable to the facts established by the evidence in this case and substantially embodied the requirements of Section 15, Article 3, Chapter 62, Code, 1931, which, in connection with a verdict of guilty of murder of the first degree provides that if the jury should find the accused guilty of murder of the first degree it may in its discretion further find that he be punished by confinement in the penitentiary and that if such further finding be not added to the verdict the accused shall be punished with death, but if added, he shall be punished by confinement in the penitentiary during his life. The instruction expressly informed the jury of the effect of the form of its verdict. From the language of the instruction that if the jury should find that the defendant should be punished by confinement in the penitentiary for life it should so find in its verdict and that if it should find that he should be punished by death the verdict should be "We, the jury find the defendant guilty of murder in the first degree as charged in the indictment", it can not reasonably be asserted that the jury was not plainly informed, or that the jury did not fully understand, that, by omitting, as it did, the finding that the defendant should be punished by confinement in the penitentiary, *723 the jury intended any finding other than the finding that the defendant should be punished by death. It is obvious that the jury realized fully, from the language of the instruction, that under the verdict which it returned without the foregoing additional finding the mandatory sentence of death would be imposed by the trial court.
The material and controlling difference between the foregoing instruction and the instruction relating to the verdict to be returned by the jury if it should find the accused guilty of murder of the first degree in the recent case of State v. Loveless, 139 W.Va., 80 S.E.2d 442, cited in the majority opinion, is that the instruction in that case, which this Court condemned as fatally defective, did not sufficiently inform the jury of the effect of a verdict of guilty of murder of the first degree which omitted the additional finding that the accused should be punished by confinement in the penitentiary. The instruction in that case merely told the jury that "murder in the first degree is punishable by death or confinement in the penitentiary of this State for life, as the jury shall find in their verdict." Because of the incomplete character of the quoted portion of the instruction it could not be determined by the verdict of guilty of murder of the first degree whether the jury intended that the defendant should be punished by confinement in the penitentiary for life or by death. The failure of the court to incorporate in the instruction given in that case sufficient information to make clear to the jury the effect of the verdict and to enable the jury to indicate clearly whether it intended that the accused should be punished by confinement in the penitentiary for life or by death constituted reversible error.
From the foregoing discussion of the fundamental difference between the instruction given in State v. Loveless, 139 W.Va. , 80 S.E.2d 442, and the instruction here under consideration, relating to the punishment to be inflicted under a verdict of guilty of murder of the first degree, it is clear that the holding of this Court, condemning the instruction in that case, has no present application and is not controlling in the decision of this case.
The cases of State v. Goins, 120 W.Va. 605, 199 S.E. 873, and State v. Chaney, 117 W.Va. 605, 186 S.E. 607, also cited in the majority opinion, are likewise not in point. In those cases this Court held that it is the mandatory duty of the trial court, in a prosecution for murder, to inform the jury, without request, of its authority under the statute to determine whether the accused, if found guilty of murder of the first degree, shall be punished by death or confinement in the penitentiary for life, and to instruct the jury that, in the event it returns a verdict of guilty of murder of the first degree, the jury may further find that the accused be punished by confinement in the penitentiary, in which case he shall be sentenced to life imprisonment, and that otherwise the accused shall be punished by death. In State v. Chaney, 117 W.Va. 605, 186 S.E. 607, referring to the instruction given by the trial court, this Court said: "The jury was instructed concerning the elements constituting murder in the first and second degrees, but the record is silent as to whether they were advised of their authority under Code (1931) 62-3-15, to determine whether defendant, in event of his being found guilty of murder in the first degree, should be punished by death or confinement in the penitentiary for life." In State v. Goins, 120 W.Va. 605, 199 S.E. 873, the trial court was not requested to give, and it did not give, any instruction concerning the punishment to be imposed upon the accused in the event the jury should return a verdict of guilty of murder of the first degree. In each of those cases the failure of the trial court to instruct the jury that it had the authority by its verdict of guilty of murder of the first degree to determine whether the accused should be punished by death or confinement in the penitentiary for life was held to be reversible error. It is obvious that the holding in each of those cases is inapplicable to the instruction given in the case at bar.
The contention that the trial court erred in permitting the prosecuting attorney in his closing argument to tell the jury how, in *724 his opinion, the homicide occurred is also utterly devoid of merit. The statements of the prosecuting attorney in his closing argument to the jury, and the proceedings had in connection with those statements during the argument, as shown by the record, were:
"In my opinion Gullett was driving that taxicab, going along at a moderate rate of speed, thinking about nothing, and Bragg took that pistol and put it over at his temple and pulled the trigger in order to take the money off of him that he knew that he had. The defendant reached over, grabbed the steering wheel and put his foot on the brakes and stopped the car.
"(The defendant by counsel objected to and moved to exclude from the jury the last statement of the witness, that he put his foot on the brake.) (Overruled; exception.)
"I say that is my opinion, gentlemen of the jury. Gullett is not here to tell you what happened and you do not have to rely in this case on what Bragg tells you. You have as much right to draw your own conclusions as I have * * *."
It should be clearly understood that in making those statements the prosecuting attorney did not directly misquote any of the evidence in the case for it is obvious, from the above quotation, that he was simply expressing his opinion of the way in which the homicide occurred, based upon the testimony of the defendant, the only living person who really knew what actually happened, and was merely drawing his inferences from the evidence of the defendant concerning that tragic event. This is evident from his statement "In my opinion", and from his additional statement, after the objection of the defendant had been overruled, "I say that is my opinion, gentlemen of the jury. Gullett is not here to tell you what happened and you do not have to rely in this case on what Bragg tells you. You have as much right to draw your own conclusions as I have". The prosecuting attorney was clearly entitled, in the argument of the case, to make each and all of the foregoing statements. Of course, the prosecuting attorney should not be permitted to misstate the evidence or to mention facts not embraced in the evidence or to engage in personal abuse of a defendant or a witness, for the purpose of prejudicing the jury against a defendant. But nothing of this kind can be found in the quoted portions of his argument. None of his statements was in any way prejudicial to any right of the defendant. If a prosecuting attorney is not permitted to discuss with vigor and draw reasonable conclusions from the evidence in the trial of a case his right and his duty to prosecute a criminal charge are necessarily substantially impaired or effectively destroyed, and I am unwilling to agree to the imposition of any such limitation by this or any other Court.
A prosecuting attorney is permitted to argue on inferences and to present them with zeal and vigor without undue restriction. State v. Lewis, 133 W.Va. 584, 57 S.E.2d 513; State v. Simon, 132 W.Va. 322, 52 S.E.2d 725. In State v. Lewis, 133 W.Va. 584, 57 S.E.2d 513, in considering challenged statements in the argument of a prosecuting attorney, this Court said, in point 7 of the syllabus: "Intemperate statements of a prosecuting attorney in the trial of a criminal case, based upon facts introduced in evidence during such trial, or induced by remarks of counsel for the defendant, which present to the jury inferences or conclusions deducible from such facts, but which are not prejudicial to any right of the defendant or do not result in manifest injustice to such defendant, will not justify reversal of a judgment of conviction entered upon a verdict of guilty when such verdict is fully supported by competent evidence in the case."
The only remark of the prosecuting attorney to which there was specific objection by the defendant was the statement that the defendant "put his foot on the brake." Even if this should be considered to be a misstatement of fact instead of an expression of opinion by the prosecuting attorney, such misstatement was manifestly trivial and unimportant and did not by any *725 conceivable process of reasoning result in any prejudice whatsoever to any right of the defendant. It could not have influenced or affected in any way the verdict of the jury. In State v. Corey, 114 W.Va. 118, 171 S.E. 114, a case in which sentence of death was imposed upon the defendant, this Court said: "Expressions of opinion by counsel on questions of fact involved in cases on trial are not proper. But we are not familiar with any principle which would require the setting aside of a conviction of high crime because at the trial, in the heat of argument, counsel for the state injected two or three expressions of opinion. It is only where remarks of counsel are unwarranted and prejudicial that a conviction will be set aside on account thereof. State v. Scurlock, 99 W.Va. 629, 130 S.E. 263; State v. Wolfe, 99 W.Va. 694, 129 S.E. 748." Conceding that the foregoing remark was improper, its utterance does not warrant the reversal of the judgment; and nowhere in the reports of decided cases have I found a parallel accomplishment.
It is crystal clear that the trial court did not abuse its discretion or cause manifest injustice to the defendant in permitting the foregoing portion of the argument of the prosecuting attorney and in refusing to strike it from the consideration of the jury. "The discretion of the trial court in ruling on the propriety of argument by counsel before the jury will not be interfered with by the appellate court, unless it appears that the rights of the complaining party have been prejudiced, or that manifest injustice resulted therefrom." Point 3, syllabus, State v. Boggs, 103 W.Va. 641, 138 S.E. 321. See also State v. Painter, 135 W.Va. 106, 63 S.E.2d 86; State v. Lewis, 133 W.Va. 584, 57 S.E.2d 513; State v. Simon, 132 W.Va. 322, 52 S.E.2d 725; State v. Reppert, 132 W.Va. 675, 52 S.E.2d 820; State v. Cooper, 74 W.Va. 472, 82 S.E. 358, Ann.Cas.1917D, 453; State v. Allen, 45 W.Va. 65, 30 S.E. 209; State v. Shawn, 40 W.Va. 1, 20 S.E. 873; State v. Shores, 31 W.Va. 491, 7 S.E. 413, 13 Am.St.Rep. 875.
Upon careful review and consideration of this case in its entirety, it is my deep seated conviction that the defendant had a fair trial in which no prejudicial error occurred and that the evidence overwhelmingly and beyond all reasonable doubt established his guilt of the terrible crime of murder of the first degree. I would, therefore, affirm the judgment of the intermediate court and the judgment of the circuit court which affirmed the judgment of the intermediate court.